# GILES ET. AL. *v.* MARYLAND.

No. 27. Argued October 12, 1966.—Decided February 20, 1967.

*Joseph Forer* argued the cause for petitioners. With him on the briefs was *Hal Witt.*

*Donald Needle,* Assistant Attorney General of Maryland, and *Robert C. Murphy,* Deputy Attorney General, argued the cause for respondent. With them on the brief was *Thomas B. Finan,* Attorney General.

MR. JUSTICE BRENNAN announced the judgment of the Court and an opinion in which THE CHIEF JUSTICE and MR. JUSTICE DOUGLAS join.

In December 1961, petitioners, who are brothers, were convicted of rape of a 16-year-old girl after trial by jury in the Circuit Court for Montgomery County, Maryland. In May 1964, petitioners brought this proceeding under Maryland's Post-Conviction Procedure Act, Md. Ann. Code Art. 27, § 645A (1966 Supp.).[1] Their peti-

---

[1] Petitioners had previously appealed unsuccessfully from the convictions, *Giles* v. *State,* 229 Md. 370, 183 A. 2d 359, appeal dismissed, 372 U. S. 767, and from the denial of a new trial, *Giles* v. *State,* 231 Md. 387, 190 A. 2d 627.

tion alleged that the prosecution denied them due process of law in violation of the Fourteenth Amendment by suppressing evidence favorable to them, and by the knowing use of perjured testimony against them. An evidentiary hearing was had before Montgomery Circuit Judge Moorman who, in an unreported opinion, ruled that the proofs did not sustain the allegation of bad faith or knowing use of perjured testimony by the prosecution, but did establish the suppression of evidence which, although not in bad faith, constituted a denial of due process. He therefore ordered a new trial. The Court of Appeals of Maryland, sitting *en banc,* reversed, two judges dissenting. *State* v. *Giles,* 239 Md. 458, 212 A. 2d 101. We granted certiorari. 383 U. S. 941. We would vacate the judgment of the Maryland Court of Appeals and remand to that court for further proceedings.

The rape allegedly occurred about midnight, July 20, 1961, near Rocky Gorge, a swimming and fishing spot on the Patuxent River, in a secluded, wooded area of Montgomery County. The petitioners swam and fished there from early evening with Joseph Johnson [2] and John Bowie. The prosecutrix came there by automobile shortly before midnight with her date, Stewart Foster, and two other young men. Their car ran out of gasoline near Bowie's parked car. The girl and Foster remained in the car while the other young men went for gasoline.

The girl and Foster were the State's principal witnesses. They testified that they had been sitting in the back seat of the car for some 15 minutes after the two young men left when a noise near Bowie's car attracted

---

[2] Johnson was tried and convicted of rape of the girl at a separate trial in the Circuit Court for Anne Arundel County. His application for post-conviction relief is being held in abeyance pending disposition of this case.

their attention. They saw petitioners and their companions loading something into Bowie's car. Bowie drove away and petitioners and Johnson approached the stranded car. Foster rolled up the windows and locked the doors. The girl and Foster testified that the three demanded his money and his girl and smashed the car windows with rocks to open the car doors. Foster unlocked the door on his side and told the girl to get out her side and run while he held off the three. Foster was knocked unconscious when he left the car. The girl ran into the woods followed by John Giles who caught up with her when she tripped and fell. Petitioner James Giles and Johnson joined them a few minutes later. She testified that, when one of the trio attempted to remove her clothes, she disrobed herself below the waist and submitted to all three youths without resistance because of fear.

Both petitioners testified in their own defense. Their version of the events was that the three young men approached the car and asked Foster for a cigarette, that Foster responded with epithets and reached down as if to pick up a gun or other weapon, and that they broke the windows to prevent his getting it. They said that they did not know it was a girl who fled into the woods. Petitioner John Giles testified that when he caught up with her, she offered to submit to him if he would help her escape from the others but that he declined. Petitioner James Giles testified that when he and Johnson joined the couple, the girl told the three that she had had relations with 16 or 17 boys that week and two or three more wouldn't make any difference, that she disrobed herself and invited all three of them to have relations with her, and that he and Johnson, but not petitioner John Giles, had relations with her. Both petitioners testified that the girl said that if they were

caught in the woods she would have to say she had been raped because "she was on a year's probation" and "was in trouble."

The credibility of the witnesses was thus important to the outcome of the case. The Court of Appeals recognized this in affirming the convictions on direct review: "There was some evidence tending to indicate consent on the part of the prosecuting witness, which, if believed by the trier of facts, would have been a complete defense to the charge of rape." *Giles* v. *State*, 229 Md., at 381, 183 A. 2d, at 364.[3] Credibility was also critical on the issue whether, in any event, petitioner John Giles had relations with her, as she testified, or had not, as the petitioners testified.

The evidence allegedly suppressed consisted first, of the fact that in a proceeding pending on June 20 in the Juvenile Court for Prince George's County, a caseworker had recommended probation for the girl because she was beyond parental control. Also allegedly suppressed were the facts concerning an occurrence in Prince George's County at a party on the night of August 26, 1961, five weeks after the alleged rape, and over three months before the trial. The girl had sexual relations with two men at the party, and later that night took an overdose of pills and was hospitalized in a psychiatric ward of Prince George's General Hospital for nine days as an attempted suicide. She told a friend who visited her at the hospital that the two men had raped her. The friend told her parents who reported this to Montgomery County Police Lieutenant Whalen, head of the investigation for the State's Attorney into the charge against

---

[3] "With respect to the presence or absence of the element of consent, it is true, of course, that however reluctantly given, consent to the act at any time prior to penetration deprives the subsequent intercourse of its criminal character." *Hazel* v. *State*, 221 Md. 464, 469, 157 A. 2d 922, 925.

petitioners. Lieutenant Whalen advised the mother that he had no jurisdiction of Prince George's County offenses, after which the girl's father filed a formal charge of rape against the two men with the Prince George's County authorities. A Prince George's County police officer, Sergeant Wheeler, interviewed the girl at the hospital. She refused to say she had been raped. She told the officer she had previously had relations with one of the men and also that in the previous two years she had had sexual relations with numerous boys and men, some of whom she did not know.

Finally, the prosecution allegedly suppressed facts concerning a hearing conducted in the Montgomery County Juvenile Court on September 5, 1961, apparently the day after the girl's release from her nine-day confinement in the psychiatric ward at Prince George's General Hospital, and three months before the trial. The hearing resulted in the commitment of the girl to the Montrose School for Girls where she remained for some time. Lieutenant Whalen testified that he had arranged this hearing with the Montgomery County Juvenile Court authorities, although the girl was a resident of Prince George's County. He testified that the girl's mother had complained to him that "the boys in Prince George's County were harassing the girl, driving back and forth past the house all hours," and that he arranged the proceeding "to place the girl in some place for protective custody." The Montgomery Juvenile Court record discloses, however, that the hearing also inquired into the necessity for the girl's confinement as a juvenile "out of parental control and living in circumstances endangering her well-being." The girl testified at the hearing that she had taken pills because she felt that "she wanted to die and there was nothing to live for."

The petitioners' contention was that all of this evidence tended to support their testimony and discredit

that of the girl and Foster and might, therefore, have produced an acquittal or, at least, a reduction of penalty.[4] They also argued that knowledge of it by the defense would have provided valuable leads to evidence supporting a conclusion that the girl testified falsely in denying that she consented to relations.

The petitioners were represented at the trial by appointed counsel.[5] He testified at the post-conviction proceeding that he knew nothing before the trial of the incidents of August 26, the girl's suicide attempt, her confinement in the hospital, the psychiatrist's diagnosis of her mental illness, or of her commitment to the Montrose School for Girls. He testified that he had tried, before August 26, to interview the girl at her home but that her mother told him "she talked to Lt. Whalen and he told her not to discuss the case with us." He also testified that, based on petitioners' story to him that the girl had told them she was on probation, he inquired of the Juvenile Courts of both Prince George's County and Montgomery County whether there were any proceedings in those courts concerning the girl and was told records of such proceedings were not released.

Judge Moorman found "that the State withheld from the defense and suppressed both the evidence concerning

---

[4] If the jury which finds an accused guilty of rape adds to its verdict the words "without capital punishment," the court may not impose the death penalty but only imprisonment for not exceeding 20 years in the penitentiary. Md. Ann. Code Art. 27, § 463 (1957). If the jury does not add such words to its verdict, the court, at its discretion, may impose the death sentence, a life sentence, or a sentence in the penitentiary for not less than 18 months nor more than 21 years. Md. Ann. Code Art. 27, § 461 (1957). The jury did not add to its verdict the words "without capital punishment," and the trial judge imposed death sentences. Governor Tawes subsequently commuted the sentences to life imprisonment.

[5] Other counsel are representing them in the post-conviction proceedings.

the second rape complaint of the prosecutrix and the evidence relative to her alleged attempted suicide and emotional disturbance." He ordered a new trial, despite the absence of a pretrial request by defense counsel for disclosure of the evidence suppressed. See *Brady* v. *Maryland*, 373 U. S. 83, 87.

The Court of Appeals read Judge Moorman's opinion to hold that nondisclosure of evidence by the prosecution denies the accused due process if the evidence could reasonably be considered admissible and useful to the defense. The Court of Appeals viewed that formulation to be incomplete, holding that "for the nondisclosure of evidence to amount to a denial of due process it must be such as is material and capable of clearing or tending to clear the accused of guilt or of substantially affecting the punishment to be imposed in addition to being such as could reasonably be considered admissible and useful to the defense." 239 Md., at 469–470, 212 A. 2d, at 108. The court found the evidence allegedly suppressed did not meet that test and held that in any event "the failure of the prosecution to disclose the information relating to the alleged rape of August 26th and the subsequent suicidal attempt was not prejudicial to . . . [petitioners] and did not therefore warrant the granting of a new trial on the basis of the denial of due process." 239 Md., at 471, 212 A. 2d, at 109.

The facts found by Judge Moorman do not include elements present in earlier decisions which determined that the suppression of evidence constituted the denial of due process of law. See *Mooney* v. *Holohan*, 294 U. S. 103; *Pyle* v. *Kansas*, 317 U. S. 213; *Alcorta* v. *Texas*, 355 U. S. 28; *Napue* v. *Illinois*, 360 U. S. 264; *Miller* v. *Pate, ante,* p. 1; compare *United States ex rel. Almeida* v. *Baldi*, 195 F. 2d 815; *United States ex rel. Thompson* v. *Dye*, 221 F. 2d 763; *Barbee* v. *Warden*, 331 F. 2d 842. Thus the case presents the broad ques-

tions whether the prosecution's constitutional duty to disclose extends to all evidence admissible and useful to the defense, and the degree of prejudice which must be shown to make necessary a new trial. We find, however, that it is unnecessary, and therefore inappropriate, to examine those questions. In *Napue* v. *Illinois, supra,* 360 U. S., at 269, we held that a conviction must fall under the Fourteenth Amendment when the prosecution "although not soliciting false evidence, allows it to go uncorrected when it appears," even though the testimony may be relevant only to the credibility of a witness. We now have evidence before us, which neither Judge Moorman nor the Court of Appeals considered, which in our view justifies a remand to the Court of Appeals for its consideration whether that court should order an inquiry to determine whether such a situation arose at petitioners' trial. The evidence consists of two police reports, not part of the record, which came to our attention when the State at our request supplied the material considered by the trial judge in imposing sentence.

On the morning after the alleged rape, July 21, 1961, Montgomery County police officers, including Lieutenant Whalen and Detective Collins, conducted interviews with the girl and Foster. The interviews were written up in one of the police reports. In an effort to prove the allegations of the petition, defense counsel moved during the post-conviction proceedings that Lieutenant Whalen be directed to produce the report for inspection. The motion was denied; Judge Moorman ruled the report was a police "work-product" and therefore not producible under Maryland's Rules of Procedure.

There can be little doubt that the defense might have made effective use of the report at the trial or in obtaining further evidence. In the first place, the report attributes statements to the girl and Foster that appear inconsistent with their trial testimony. The report quotes

both as stating they were engaged in sexual relations when they were distracted by the noise at Bowie's car, and that the girl dressed before petitioners and Johnson approached. They testified at trial, however, that they were merely "sitting" in the back seat of the car from the time their companions left until their attention was drawn to the presence of the four men at Bowie's car, and Foster buttressed this testimony on cross-examination by answering "No" to the question whether he "didn't take her out there to have sexual relations with her, yourself . . . ?" Finally, neither Lieutenant Whalen nor Detective Collins mentioned, in their summaries at trial of what each person involved in the incident had told them, the fact that the girl and Foster had stated they were engaged in sexual relations when they heard the three men.

The testimony of the girl and Foster is open to the construction that these key witnesses deliberately concealed from the judge, jury, and defense counsel evidence of the girl's promiscuity.[6] While under the law of Maryland specific acts of misconduct are inadmissible to impeach a witness' credibility, *Rau* v. *State*, 133 Md. 613,

---

[6] The dissenting judges in the Court of Appeals were of the view that the extensive evidence of the girl's reputation for unchastity presented in the post-conviction record, added to the evidence of her emotional instability, might support a defense that she suffered from an uncontrollable weakness that petitioners might reasonably have mistaken for consent. The majority apparently were also of the view that under some circumstances suppression of evidence pertaining to a witness' mental condition might amount to a deprivation of due process. If this is so, the conclusion of the majority that no such evidence existed or was suppressed in this case is open to question, since the post-conviction court prevented all attempts of counsel to introduce evidence of the girl's condition (including a psychiatric diagnosis and evidence presented at a juvenile proceeding) or of the fact that Montgomery County police officials knew of such evidence. If a new hearing is held in the state courts, an inquiry into these matters might be deemed appropriate.

105 A. 867, and specific acts of intercourse are inadmissible to establish the prosecutrix' consent, *Humphreys v. State,* 227 Md. 115, 175 A. 2d 777, prior inconsistent statements and evidence of general reputation for unchastity are admissible to impeach a witness' credibility, see *Giles v. State,* 229 Md. 370, 183 A. 2d 359. And to the extent credibility could have been effectively attacked in this case, resolution of the issue of consent necessarily would have been affected since it turned wholly on credibility.

The report could also have been used in connection with an issue which has been in this case from its inception. At the original trial, counsel sought in numerous ways to establish that John Giles had not had intercourse with the victim. At the trial the girl said all three had raped her. She admitted, however, that she had testified at the preliminary hearing and had told the police immediately after being attacked that only two of the three had intercourse with her. Detective Collins testified, on the other hand, that he "questioned the girl at the station and she said all three of the boys had intercourse with her." With specific reference to John Giles, Collins stated that the girl "was asked if she knew anybody in this line-up and she walked over and pointed to the defendant, John Giles, and stated to us, in his presence, that he was the first . . . that had intercourse with her . . . ." Lieutenant Whalen denied that the girl had told him "that only two of these boys had intercourse with her on that evening . . . ."

Counsel at the post-conviction proceedings continued to attempt to prove John Giles was innocent of rape. He introduced newspaper articles from the Washington Evening Star and the Washington Post attributing to Lieutenant Whalen a story that the girl had said only two men had raped her. When Whalen said these stories were incorrect, counsel asked: "would your interview

report of this interview show what . . . [she] said about the number of men who attacked her?" Whalen answered that it would. Counsel thereupon moved for the production of the report, but the court refused to allow him to see it because of the work-product rule. Counsel also asked the girl how many men she originally claimed had raped her and, unlike her testimony at trial, she said she had told the police all three had raped her.

In contrast to much of this testimony the police report states that, both when interviewed and at a police lineup later that day, the girl identified petitioner John Giles not as the first to have intercourse with her, as Detective Collins testified, but as "the one that tried to have intercourse with her but was unable to do so," "the man that tried to rape her . . . ." The contents of the report thus go, not only to the credibility of the State's witnesses, but also to the issue at trial whether John Giles had raped the girl. Yet nothing appears in the trial transcript to show what, if any, action was taken by the prosecution to correct or explain the inconsistencies between the testimony of the state witnesses and the report.[7]

Only the most strained reading of the materials before us can explain away the questions raised by the report without the aid of further inquiry. A second report, filed by Sergeant Duvall who was first at the scene of the incident, far from proves that John Giles penetrated the girl. His report recites that the girl "stated that two of the . . . males had entered her and that the third had tried but gave up when he saw lights coming."

---

[7] The record before us affirmatively demonstrates that both Detective Collins and Mr. Kardy, who supervised the prosecution, had read the report before trial. Collins testified at the trial that he wrote up the report and had read it the night before. At the post-conviction hearing Kardy was asked: "[Y]ou saw the police report prior to trial, of course? A. Yes."

While this statement would seem to indicate that John Giles, who was the first to attempt intercourse, penetrated the girl, it must be read in light of the fact that Duvall's report is a two-page, third-person summary, representing what had transpired during the tense and hectic moments immediately after the incident, when the girl was nearly hysterical according to police testimony. The other report, in contrast, is 22 pages long, was put together over at least a three-day period, and contains extensive quotations of the girl's story taken down in the relative calm of the police station after the girl had been treated and fed, including her reaction in personally identifying John Giles as the one who failed to have intercourse. Moreover, Duvall's report does state that the girl told him that only two of the men entered her, and therefore provides no explanation for the officers' testimony that she had said all three had entered her. In fact, far from explaining the police testimony, the report raises a serious question as to the accuracy of Sergeant Duvall's testimony at the original trial that he never discussed with the girl the number of boys who had had intercourse with her.[8]

The State attempted in the post-conviction proceedings to explain the girl's inconsistent statement at the preliminary hearing by contending that she was unaware of the difference between the meaning of intercourse and emission, which caused her to testify at first that only two of the men had had intercourse with her. The state

---

[8] The testimony was as follows:

"Q. Did you have a discussion with this girl about how many boys had had intercourse with her? . . .

"A. No.

"Q. You say you did not?

"A. No, sir.

"Q. You never did discuss that with her?

"A. No, sir."

witness who propounded this theory did not offer it at the original trial, in which he participated, although the girl's explanation then was that she was confused about the names of the defendants, not about the difference between intercourse and emission.[9] And the report reveals no confusion on the latter point. She spoke there of intercourse as a "process," and at one point stated that the second of the youths "had intercourse for about ten minutes and reached a climax."[10] She said of John Giles, not that he failed to reach a climax, but that he failed to "insert" because he "could not get" an erection. Of course it is possible that she was confused despite this evidence, and that John Giles achieved penetration. But it is not our place to decide these issues, either for or against petitioners; we need only determine that the evidence raises an issue of sufficient substance to justify remanding this case for reconsideration rather than deciding the broader constitutional question.[11]

Original trial counsel testified at the post-conviction proceeding that he had seen the prosecution's file before

[9] "Q. Why are you telling a different story today than the story you told the police immediately after this happened, and the story you told at the preliminary hearing?

"A. Because I have thought about it.

"Q. What do you mean you have thought about it?

"A. Well at the time I was confused—people were giving names, and I had no idea of what the boys' names were.

"Q. Who was given names?

"A. After the line-ups; after I had identified all three of the men."

[10] The report recites that she was asked the following questions, apparently by Lieutenant Whalen, and gave the following answers:

"Q–W. How many of them had intercourse with you?

"A. The bigger one [John] tried first, then the other two.

"Q–W. Did any of them have an emission?

"A. Yes, the second one and maybe the third."

[11] Certainly the test cannot be, as is suggested, that a remand would be justified only if the evidence presented "necessarily excludes the conclusion that John Giles achieved penetration, however slight."

trial, including the police reports. Since the reports were not produced, it is pure speculation to conclude that trial counsel had in fact seen the reports now before us. And if it were proper to resolve this question against petitioners, the Court of Appeals might nevertheless regard an inquiry to be in order to ascertain trial counsel's reasons for not making use of the reports in support of the defense he was directing on behalf of petitioners. Finally, the determination of these questions against petitioners would still leave open the question whether the Court of Appeals might regard the situation as one in which the prosecution was under a duty to disclose the discrepancies to the trial judge; the court stated in its opinion that, where there is doubt as to what should be disclosed, "the trial court should decide whether or not a duty to disclose exists." 239 Md., at 471, 212 A. 2d, at 109.

In relying upon material not part of the record as a reason for remand, we follow our practice of noticing supervening matter in order to avoid deciding constitutional questions by allowing state courts to take action which might dispose of the case. See for example, *Patterson* v. *Alabama*, 294 U. S. 600; *Bell* v. *Maryland*, 378 U. S. 226. We follow this practice under varying circumstances, but the principle behind it has always been the same. This Court has "discretion as to the time and mode in which it will exert the powers conferred upon it. That discretion should be exercised in the light of the relations existing, under our system of government, between the judicial tribunals of the Union and of the States, and in recognition of the fact that the public good requires that those relations be not disturbed by unnecessary conflict between courts equally bound to guard and protect rights secured by the Constitution." *Ex parte Royall,* 117 U. S. 241, 251.

It is not for us to direct what the Maryland courts will do in this case. The Court of Appeals may, for all we know, determine that the additional evidence demonstrates prejudice to the degree necessary under its previously applied standard to warrant a new trial. It may remand for a hearing free of the "work product" rule. It may reaffirm its judgment of reversal. Although relief may ultimately be denied, affording the state courts the opportunity to decide in the first instance is a course consistent with comity, cf. 28 U. S. C. § 2254, and a full and fair hearing in the state courts would make unnecessary further evidentiary proceedings in the federal courts. See *Townsend* v. *Sain,* 372 U. S. 293. We would remand because of our conclusion that the police reports, considered in the context of the record before us, raise questions sufficient to justify avoiding decision of the broad constitutional issues presented by affording the opportunity to the Maryland Court of Appeals to decide whether a further hearing should be directed. See *Henry* v. *Mississippi,* 379 U. S. 443.

The truism that our federal system entrusts the States with primary responsibility in the criminal area means more than merely "hands off." The States are bound by the Constitution's relevant commands but they are not limited by them. We therefore should not operate upon the assumption—especially inappropriate in Maryland's case in light of its demonstrated concern to afford post-conviction relief paralleling that which may be afforded by federal courts in habeas corpus proceedings [12]— that state courts would not be concerned to reconsider a case in light of evidence such as we have here, particu-

---

[12] See *Hunt* v. *Warden,* 335 F. 2d 936, 941–943 (C. A. 4th Cir., 1964); *Midgett* v. *Warden,* 329 F. 2d 185 (C. A. 4th Cir., 1964), and the other cases discussed in Note, 40 N. Y. U. L. Rev. 154, 193–195 (1965).

larly where the result may avoid unnecessary constitutional adjudication and minimize federal-state tensions.

We would therefore vacate the judgment of the Court of Appeals and remand to that court for further proceedings.

MR. JUSTICE WHITE, concurring in the judgment.

I concur in the judgment of the Court, although I am unable to join the opinion of my Brother BRENNAN. In my view, there was no violation of the rule of *Napue* v. *Illinois,* 360 U. S. 264. The argument is that at the trial the police officers testified that the complaining witness had said, all along, that three men had raped her, whereas the police reports supplied to the Court after oral argument clearly indicate that the complaining witness had told the officers at one point that only two men had raped her. Although the fact misstated by the police at trial bears primarily upon the credibility of the officers who testified, it might be argued that in addition the false testimony bore some relationship to the credibility of the prosecuting witness and to the question whether both of the petitioners had in fact committed rape. But these issues were not overlooked by petitioners' counsel at trial, who then confronted the complaining witness with the inconsistency in her allegations. Had petitioners' counsel been less diligent, the false testimony might rise to the level of a *Napue* violation.[1]

---

[1] The fact that petitioners' counsel at trial had knowledge of the police reports is of course relevant. At the post-conviction hearing the trial counsel, Mr. Prescott, was questioned concerning his knowledge of the police reports.

"Q. Mr. Prescott, after your appointment as counsel for the Giles boys in this case, did you come to see me, as State's Attorney, to discuss the case?

"A. I did.

"Q. And would you relate to His Honor what that discussion

Concerning the testimony given by Foster as to why he was with the complaining witness on the evening of the alleged rape there can be no argument under *Napue*, a point made clear by the opinion of my Brother HARLAN.

Nevertheless, for the reasons which follow I concur in the judgment remanding the case to the Maryland Court of Appeals for further consideration.

Petitioners here were appellees in the Maryland Court of Appeals, having prevailed in the trial court in their post-conviction attempt to win a new trial. In the Maryland appellate court, they sought to sustain the judgment not only on the grounds stated by the Circuit Court—suppression of evidence with respect to an alleged false rape claim and a suicide attempt—but on the additional ground that the State had suppressed other evidence, including evidence with respect to the rape victim's reputation for promiscuity and evidence with respect to her mental condition. The Maryland Court of Appeals apparently considered it appropriate and important to dispose of these additional suppression claims. With respect to reputation for unchastity the court acknowl-

---

consisted of and what, if anything, I let you see and have in the case?

"A. You let me have your entire file as I recall. . . . ·

"Q. And by the entire file, did I let you read the police report in its entirety, sir?

"A. You did.

 · · · · ·

"The Court: Mr. Prescott, I understood you to say that Mr. Kardy, while you were preparing for the trial and before trial, let you see his complete file, including the police reports?

"The Witness: That is correct, Your Honor.

"The Court: And you are satisfied that Mr. Kardy did show you the police reports, which he didn't have to do?

"The Witness: Well, I am not sure he didn't have to, but he did show them to me, Your Honor." Transcript of Post-Conviction Hearing, Vol. II, 11, 13.

edged the admissibility of such evidence where consent is an issue. The court held, however, that the prosecution could not be charged with withholding reputation evidence since the defense itself had ample knowledge of the promiscuous conduct of the prosecuting witness. As to her mental condition, the court cited with approval *People* v. *Bastian*, 330 Mich. 457, 47 N. W. 2d 692 (1951), apparently conceding that evidence of "nymphomania"—which the court referred to as a "type of mental illness"—was admissible in a case such as this. But the court held (1) that the prosecution could be charged only with the knowledge that the mother of the victim had at one time taken her to a psychiatrist; (2) that there was nothing in the record to show that the victim was suffering from nymphomania; and (3) that even if she was so afflicted, "there is nothing to show that this made her incompetent as a witness or that she consented to the acts for which the appellees were convicted."

Of course, the court's ultimate result unavoidably followed from these factual determinations and it would appear that the evidence now in the record is consistent with these conclusions. But this does not end the matter in my view, if the inquiry permitted the petitioners in the trial court was not all that the Maryland law allows or that the constitution requires. And based on the record as it comes here, I am not at all sure that there has been a full airing of the suppression issue or that the petitioners are responsible for the obvious shortcomings in the evidence with respect to the mental condition of the rape victim and the prosecution's knowledge with respect to this matter. I am sufficiently unsure that I would remand for further consideration by the Maryland Court of Appeals.

To set in perspective those parts of the record which concern me, a brief summary of the facts is necessary.

In chronological order, this case involves the alleged rape by petitioners, a subsequent occasion upon which the complaining witness experienced sexual intercourse with two young men (which led to the so-called false rape claim), a suicide attempt by the complaining witness followed by temporary hospitalization in a psychiatric ward, a juvenile court proceeding as a result of which the complaining witness was sent away from her home, and finally the trial at which the petitioners were convicted. While the complaining witness was hospitalized, she was subjected to a psychiatric examination by Dr. Doudoumopoulis, who related his opinion to Dr. Connor, who in turn spoke with the parents of the complaining witness. In addition, and highly relevant to the issue of suppression, the record of the juvenile court proceedings reflects the fact that Lieutenant Whalen of the Montgomery County Police Department had discussed the matter of confinement of the complaining witness with Dr. Connor and had arranged for and participated in the juvenile court hearing.

The following excerpts from the post-conviction hearing transcript are the source of my concern with the record as it comes to us.

Dr. Connor testified that he had seen the complaining witness daily during her hospitalization following the suicide attempt.

"Q. And on the subsequent days could you tell us what part of the hospital you saw her, which ward?

"A. I saw her on A Wing, which is the psychiatric ward.

"Q. Did you request Dr. Doudoumopoulis to make a psychiatric evaluation of Miss Roberts?

"A. Yes, I did.

"Q. And did he report to you his evaluation or diagnosis of her case?

"A. Yes, he did.

"Q. Did you concur with him?

"A. Yes, I did.

"Q. Could you tell us what that diagnosis or evaluation was?

"Mr. Kardy: Just a minute, doctor. Object, Your Honor.

"The Court: Objection sustained."

Subsequently, Dr. Connor, who had not performed the psychiatric examination, was allowed to testify concerning his nonpsychiatric diagnosis of the patient, and his conclusion was "adolescent reaction." The failure of the hearing to produce, through Dr. Connor, any meaningful testimony regarding the psychiatric condition of the complaining witness might have been presaged by the testimony the same Doctor was allowed to give on deposition [2] prior to the post-conviction hearing, the contents of which follow:

"Q. Did you see [Joyce Carol Roberts] during the hospitalization?

"A. During the hospitalization, yes.

"Q. At that time did you have occasion to speak to Lieutenant Whalen of the Montgomery County Police Department about Joyce?

"A. I spoke to someone from the Montgomery County Police Department during that period. I don't know just exactly who it was or the exact date, but I do recall talking to someone about her.

"Q. And where did that conversation take place?

"A. I believe it was in my office at 4713 Berwyn Road, in College Park. My office was there.

"Q. Will you state the substance of that conversation?

"Mr. Kardy: I object.

---

[2] The deposition was conducted by the same judge who presided at the post-conviction hearing.

"The Court: The objection is sustained.

"Mr. Witt: Your Honor, we are seeking to find out what information was given to the State about the credibility of this witness.

"The Court: He has not testified that he talked to anyone from the State; he said he talked to someone in Montgomery County.

"Mr. Witt: Montgomery County Police Department, Your Honor.

"The Court: He said, 'to someone,' as I heard his answer.

"Mr. Witt: Can we have the answer read back?

"The Court: Doctor, can you identify the person to whom you talked?

"The Witness: No, sir; I cannot. I recall there was someone from the police department.

"Mr. Kardy: Of Montgomery County?

"The Witness: Of Montgomery County.

"The Court: Counsel, do you proffer to show that from that conversation the State's Attorney had knowledge that there was evidence suppressed which would have been a defense to the crime?

"Mr. Witt: Yes, Your Honor.

"The Court: What specifically do you proffer to show?

"Mr. Witt: We proffer to show that the State had knowledge of this girl's psychiatric condition at the time.

"The Court: What difference would that make?

"Mr. Witt: It is under Napue against Illinois. Evidence respecting the credibility of a witness which is in the possession of the State at the time of the trial and which is suppressed by State is a violation of due process.

"The Court: I will sustain the objection.

"Q. Did you at that time have occasion to speak to either or both of Joyce's parents?

"A. Well, I was speaking to her mother on frequent occasions, and I spoke to her father on one or more occasions, I don't recall how often.

"Q. And did you discuss with them what should be done for Joyce?

"A. Yes.

"Q. Will you state what was said?

"Mr. Kardy: Just a minute, Doctor. I object.

"The Court: Objection is sustained.

"Q. Did either of them tell you about any other alleged rape of Joyce?

"Mr. Kardy: I object.

"The Court: Sustained.

"Q. Did any member of Joyce's family tell you about any other alleged rape of Joyce?

"Mr. Kardy: I object.

"The Court: Sustained.

"Q. In the course of your treatment of Joyce during this period, did you have occasion to call in another doctor?

"A. Are you referring to hospitalization?

"Q. Yes.

"A. Yes, I did.

"Q. And who was that doctor?

"A. Dr. Doudoumopoulis.

"Q. Did you discuss Joyce with him after he had seen her?

"A. Yes, I did.

"Q. Did he diagnose her as a juvenile schizophrenic?

"Mr. Kardy: Just a minute; don't answer that. I object.

"The Court: The objection is sustained.

"Q. Did you discuss with Dr. Doudoumopoulis what treatment Joyce should receive?

"Mr. Kardy: I object. . . .

"The Court: I think it is immaterial. I will sustain the objection."

Immediately after Dr. Connor's deposition was taken, Lieutenant Whalen of the Montgomery County Police Department was put under oath. Lieutenant Whalen testified that he had contacted Mr. Kardy, the prosecutor, and that they arranged for a hearing in the juvenile court in Montgomery County on September 5, 1961. The reason for seeking protective custody for the girl was that, in Whalen's words: "[T]he boys in the area were harassing the girl so bad that she [the mother] would like to get some help for the girl. . . ."

"Q. Were you present throughout that juvenile court hearing of September 5, 1961?

"A. I was in and out of the courtroom. I was not there every second.

"Q. Let me go back a minute; isn't it a fact that prior to this hearing you had talked to Dr. Connor with respect to Joyce Roberts' mental condition?

"Mr. Kardy: I object.

. . . . . .

"Mr. Forer: . . . Your Honor, we had Dr. Connor on the stand earlier today, and Dr. Doudoumopoulis; we were trying to lay a foundation by showing that the girl's condition was such that it would have affected her credibility. Dr. Doudoumopoulis actually was qualified, as a qualified psychiatric expert, to say if it would have affected her credibility. It would have been relevant to whether or not she invited this intercourse or rejected it.[3] And with

[3] In the course of the post-conviction hearing, the defendants also attempted to probe the relationship between the mental condition

90

Dr. Connor we also. brought out whatever the doctors discovered he had told some representatives from the Montgomery County police. But Your Honor excluded our questioning designed to go into the mental condition of the girl. Now, Your Honor is excluding my asking him whether he knew about it on the grounds that we have not established the significance of the mental condition.

"The Court: I will sustain the objection. I do not think it is proper in this procedure.

. . . . .

"Q. Now let us go back to this juvenile court hearing in Montgomery County, September 5, 1961. Was anything said at the juvenile court hearing about the fact that Joyce Roberts had attempted to commit suicide shortly before that date?

"Mr. Kardy: I object.

"The Court: I will sustain the objection."

---

of the complaining witness and her credibility through questions put to Dr. Frederic Solomon, a qualified psychiatrist.

"Q. Doctor, do you have an opinion about how the mental illness, which you have described, would affect the credibility of a witness about the kind of circumstances which I described, that is, an intensely personal situation in which personal motivations were involved?

"Mr. Kardy: Object.

"The Court: You can answer it merely yes or no.

"The Witness: Yes.

"Mr. Witt: What is that opinion?

"Mr. Kardy: Object.

"The Court: Sustained.

"Mr. Witt: Your Honor, I offer to prove that his opinion would be that the mental illness which he has described would substantially affect the credibility of such a person about such an incident.

"The Court: Well, I never heard of such a rule. I sustained the objection. It's up to a jury to determine the credibility. How can we take and let a man, after a trial has occurred, come in and say the credibility was no good?" Transcript of Post-Conviction Hearing, Vol. II, 64.

The day before the post-conviction hearing began, Dr. Doudoumopoulis, although subject to a bench warrant, had "left for Maine" for two weeks. In all fairness to the presiding judge, it should be noted that he offered to continue the hearing until the Doctor could be reached for his testimony. But on the other hand, the counsel for petitioners perhaps had no reason to expect that the course of the post-conviction hearing would run any differently from that at the deposition proceeding in advance of the hearing,[4] where Dr. Doudoumopoulis, and the petitioners' counsel, could achieve only the following interchange.

"Q. Dr. Doudoumopoulis, on or about August 26, 1961, in the course of your practice, did you have occasion to see a girl by the name of Joyce Carol Roberts?

"A. I saw her on the 28th of August, 1961.

"Q. Where did you see her?

"A. At Prince George's Hospital.

"Q. What caused you to see her?

"Mr. Kardy: I object.

"The Court: I will overrule it. I will permit that.

"Q. You may answer.

"A. Dr. Charles D. Connor had asked me to make a psychiatric evaluation of her.

"Q. Did you interview her?

"A. Yes, I did.

"Q. Did you reach any conclusions about her condition?

"Mr. Kardy: Just a minute, Doctor. I object.

---

[4] This deposition proceeding was also conducted by the same judge who presided at the post-conviction hearing.

92

"Mr. Witt: Your Honor, we are seeking to discover what the doctor's diagnosis was, and then to link it up with the knowledge of the State with respect to that condition. That is the purpose.

"The Court: The objection is sustained.

"Q. Do you know Dr. Charles Connor?

"A. Yes.

"Q. Did you discuss Joyce with him? :

"A. Yes.

"Q. Did you tell him your conclusions—

"Mr. Kardy: I object.

"Q. —in respect to Joyce's condition?

"Mr. Kardy: I object.

"The Court: He can answer it yes or no.

"The Witness: Yes.

"Q. Did you discuss with him what should be done for Joyce?

"A. Yes.

"Q. Will you tell us the discussion with respect to what should be done with Joyce at that time?

"Mr. Kardy: I object.

"The Court: Sustained.

"Q. Did you talk to Joyce's parents?

"A. I think it was the mother that I talked to.

"Q. Did you have any discussion with her with respect to what should be done for Joyce? . . . Did you discuss a hospitalization of Joyce?

"Mr. Kardy: I object.

"The Court: The objection is sustained."

Because the record of the juvenile court proceeding clearly indicated that psychiatric evidence concerning

the complaining witness had flowed from the doctors
into that hearing, the record of which also reflected the
presence of Lieutenant Whalen, the petitioners' counsel
sought to pursue their inquiry through Mr. Lynn Adams,
an officer of the juvenile court who had been instru-
mental in the juvenile court proceedings. This inquiry
was likewise cut short:

"Q. Now, it is a fact, is it not, a Lieutenant Detec-
tive Whalen of the Montgomery County Police
Department was also present at that hearing?

"A. Yes, according to my information it was.

"Q. It is a fact, is it not, that the charge against
Joyce Roberts was that she was out of parental
control and living in circumstances endangering her
well-being?

"Mr. Kardy: Object.

"The Court: Sustained.

"Q. Was it brought out at this hearing that Joyce
Roberts had attempted to commit suicide shortly
before the hearing?

"Mr. Kardy: Just a minute, Mr. Adams. Object.

"The Court: Sustained.

. . . . .

"Q. Was it brought out at this hearing that in
late August of 1961 Joyce Roberts had accused two
men of raping her?

"Mr. Kardy (To the Witness): Just a minute.
Object.

"The Court: Sustained.

. . . . .

"Q. Did you speak, by telephone or otherwise,
with a psychiatrist by the name of Dr. Alexander
Doudoumopoulis?

. . . . .

"A. Yes.

. . . . .

"Q. Did he give you any information regarding the mental condition or mental health of Joyce Roberts in this conversation that you had with him?

"A. Did he—yes, regarding the mental health, yes.

"Q. What was the information that he gave you regarding Joyce Roberts' mental health in this conversation?

"Mr. Kardy: Just a minute. Object, Your Honor.

"The Court: Sustained."

The presiding judge seems to have closed off Mr. Adams as a source of information on the ground that he had no other choice under Rule 922 of the Maryland Rules of Procedure governing juvenile causes. The rule specifies that:

"A person having a direct interest in a case may examine any part of the record thereof, except medical and case histories and other reports which the court may designate confidential. Such a person may also examine such histories and confidential reports with prior written permission of the court. The court may, however, from time to time, designate by general orders persons or agencies who may inspect any record, or specific classes of records, without additional written permission. Except as provided herein, no other person may examine any juvenile record, including the docket, without prior written permission of the court." Md. Ann. Code c. 900, Rule 922.

At the post-conviction hearing, the petitioners held an authorization of the juvenile court to examine the records concerning the September 5, 1961, hearing. The authorization included permission to "make available said records for use, including introduction into evidence . . . and to any persons with knowledge thereof to testify about any aspect of the proceedings . . . in-

volving said Joyce Carol Roberts." [5] The presiding judge in the post-conviction hearing was of the view that Rule 922 allowed the juvenile court only the power to make the record available for examination, not to "put it in evidence." See Vol. I, Post-Conviction Hearing Transcript, at 66. This, of course, does not explain why the judge himself did not examine the record, as he had expressly been authorized to do by the juvenile court. Had the judge made such an examination, he might have concluded that his decision regarding the admissibility of the record and of testimony by witnesses who had attended the hearing would require a more complete consideration of the purpose of and policies served by Rule 922. And in any event—although this is a matter of Maryland law about which I am not at all sure—the Rule would not seem to be a bar to testimony by those who had attended the juvenile court hearing when asked questions concerning information obtained outside the juvenile court hearing. If I am correct in this regard, the Rule could not stand in the way of testimony by Dr. Connor as to his conversations with Dr. Doudoumopoulis, or as to his conversations with the Montgomery County police officer, or as to any conversations either of the doctors might have had with Mr. Lynn Adams outside the juvenile court hearing. An additional matter raises my doubts further about the force which Rule 922 should have had at the post-conviction hearing. The State has since supplied this Court with what is apparently the complete file and record of the September 5, 1961, juvenile court proceedings involving the complaining witness. The State apparently no longer considers Rule 922 a bar to judicial consideration of these items. I do not wish to suggest that the presiding judge's exclusion of the juve-

---

[5] This document is included in the record at page 274.

nile court record, and of possible testimony of Adams, Whalen, Connor, and Doudoumopoulis was necessarily incorrect. But the duty to make that decision and the right to make it in the first instance belongs to the Maryland court, and my point simply is that the circumstances of the post-conviction hearing in this case compel a more complete consideration of the issue.

There is another matter for the consideration of the Maryland court: the prosecuting attorney of Montgomery County was not charged with the knowledge of Prince George's County officers but he was charged with what the police officers of Montgomery County knew. Was he also charged with the knowledge of other Montgomery County officials such as Lynn Adams, and, to the extent of their involvement with Montgomery County agencies, Dr. Connor and Dr. Doudoumopoulis?

In the end, any allegation of suppression boils down to an assessment of what the State knows at trial in comparison to the knowledge held by the defense. It would seem that the Maryland Court of Appeals would reverse as unconstitutional a conviction in a trial that included suppression of evidence tending to prove nymphomania, or more comprehensively, suppression of evidence concerning the mental condition of the complaining witness and the interrelated issues of her consent and credibility. If such is the case, it would be helpful to have the Maryland Court of Appeals' views as to whether on this record the petitioners have been afforded a full and fair hearing on this issue.

MR. JUSTICE FORTAS, concurring in the judgment.

I concur in the Court's judgment in this immensely troubling case, but I do so for the reasons which led the Montgomery County Circuit Court to order a new trial.

On petitioners' motion for post-conviction relief, Judge Moorman of the Circuit Court sustained the claim that

the prosecution had violated their federally protected right to due process of law when it failed to disclose to defense counsel evidence, known to the prosecution, concerning two incidents which occurred about one month after the crime charged to them and four months prior to trial. These incidents were: (1) the prosecutrix' sexual encounter with two boys at a party, followed by the filing and eventual dropping of a rape charge; and (2) her attempted suicide within hours of the foregoing incident and her ensuing hospitalization for psychiatric examination. The Circuit Court ruled that this information could "be reasonably considered admissible and useful to the defense," that in consequence the prosecution was under a duty to disclose, and that its omission to do so required a new trial.

The Maryland Court of Appeals reversed. It held that, even if admissible, the evidence in question was insufficiently "exculpatory" to warrant a new trial. The attempted suicide was shunted aside on the ground that its "probative value" was not such as to affect either the competence or credibility of the prosecutrix as a witness. Both it and the rape claim were disposed of on the assertion that "specific acts of misconduct" are not admissible to impeach credibility, and that "the only possible use of the facts surrounding the alleged rape claim would be for purposes of showing the unchastity of the prosecutrix, a fact that was already known to the defense at the time of the rape trial."

Judges Oppenheimer and Hammond dissented. They noted that the alleged rape claim and its abandonment might well have been useful in corroborating the petitioners' account of what happened, that no Maryland evidentiary rule rendered inadmissible in a rape prosecution evidence that the prosecutrix suffered from a mental or emotional disturbance short of "insanity," and that in any event these bits of information might have fur-

98

nished the defense with important leads to other and more potent evidence. The dissenters asserted that the majority erroneously substituted its appraisal of the weight to be attached to the suppressed evidence for a jury's possible evaluation, and that it erred in applying too stringent a test of admissibility.

I do not agree that the State may be excused from its duty to disclose material facts known to it prior to trial solely because of a conclusion that they would not be admissible at trial.[1] The State's obligation is not to convict, but to see that, so far as possible, truth emerges. This is also the ultimate statement of its responsibility to provide a fair trial under the Due Process Clause of the Fourteenth Amendment. No respectable interest of the State is served by its concealment of information which is material, generously conceived, to the case, including all possible defenses.

This is not to say that convictions ought to be reversed on the ground that information merely repetitious, cumulative, or embellishing of facts otherwise known to the defense or presented to the court, or without importance to the defense for purposes of the preparation of the case or for trial was not disclosed to defense counsel. It is not to say that the State has an obligation to communicate preliminary, challenged, or speculative information. But this is not that case. Petitioners were on trial for their lives. The information was specific, factual, and concrete, although its implications may be highly debatable. The charge was rape, and, although the circumstances of this case seem to negate the possibility of

[1] In *Griffin* v. *United States,* 336 U. S. 704, 707–709 (1949), this Court remanded a case for reconsideration of a ruling that certain evidence withheld by the prosecution was inadmissible. On remand, a new rule of admissibility was formulated and a new trial ordered. *Griffin* v. *United States,* 87 U. S. App. D. C. 172, 183 F. 2d 990 (1950).

consent, the information which the State withheld was directly related to that defense. Petitioners' fate turned on whether the jury believed their story that the prosecutrix had consented, rather than her claim that she had been raped. In this context, it was a violation of due process of law for the prosecution to withhold evidence that a month after the crime of which petitioners were accused the prosecutrix had intercourse with two men in circumstances suggesting consent on her part, and that she told a policeman—but later retracted the charge—that they had raped her. The defense should have been advised of her suicide attempt and commitment for psychiatric observation, for even if these should be construed as merely products of the savage mistreatment of the girl by petitioners, rather than as indicating a question as to the girl's credibility, the defense was entitled to know.

The story of the prosecutrix is a tragic one. But our total lack of sympathy for the kind of physical assault which is involved here may not lead us to condone state suppression of information which might be useful to the defense.

With regret but under compulsion of the nature and impact of the error committed, I would vacate the judgment of conviction and require the case to be retried. In view of the conclusions of my Brethren, however, I concur in the judgment of the Court sending this case back to the Court of Appeals for reconsideration.

---

ADDENDUM: My Brother HARLAN has addressed a section of his dissent to my concurring opinion. This discloses a basic difference between us with respect to the State's responsibility under the fair-trial requirement of the Fourteenth Amendment. I believe that deliberate concealment and nondisclosure by the State are not to be distinguished in principle from misrepresentation.

This Court so held in *Brady* v. *Maryland*, 373 U. S. 83 (1963). MR. JUSTICE HARLAN concedes that the State may not knowingly use perjured testimony or allow it to remain uncorrected. He asserts that this satisfies "in full" the requirements of the Fourteenth Amendment, and suggests that an extension of these principles is neither necessary nor advisable. This suggests that the State is never obligated to take the initiative to disclose evidence unless its nature is such as to impeach evidence that the State has offered. I assume that MR. JUSTICE HARLAN would apply this principle, even though the information might, in the hands of defense counsel, spell the difference between death and exoneration of the defendant. I cannot subscribe to this. A criminal trial is not a game in which the State's function is to outwit and entrap its quarry. The State's pursuit is justice, not a victim. If it has in its exclusive possession specific, concrete evidence which is not merely cumulative or embellishing and which may exonerate the defendant or be of material importance to the defense—regardless of whether it relates to testimony which the State has caused to be given at the trial—the State is obliged to bring it to the attention of the court and the defense. For example, let us assume that the State possesses information that blood was found on the victim, and that this blood is of a type which does not match that of the accused or of the victim. Let us assume that no related testimony was offered by the State. I understand my Brother HARLAN's comments to mean that he would not require the State to disclose this information. He would apparently regard *Miller* v. *Pate, ante,* p. 1, as the outer limit of the State's duty. There the prosecution dramatically used a pair of shorts, misrepresented as saturated with blood, to secure a conviction. I cannot acquiesce that this is the end of the State's duty under the Constitution. Nondisclosure—deliberate withhold-

ing—of important information of the type described, which is in the exclusive possession of the State is, in my judgment, not reconcilable with the concept of a fair trial and with the Due Process Clause. I can readily see that differences of opinion might exist as to whether the nature of particular evidence is such that nondisclosure of it should result in setting aside a conviction. But I do not accept the notion that only where the effect of withholding evidence is to allow perjured testimony to stand uncorrected is there a duty to disclose. In my view, a supportable conviction requires something more than that the State did not lie. It implies that the prosecution has been fair and honest and that the State has disclosed 'all information known to it which may have a crucial or important effect on the outcome.

The newly amended Rule 16 of the Federal Rules of Criminal Procedure has little to do with the matter now before the Court. On its face, the Rule is directed to the relatively limited problem of *pretrial* discovery and inspection in the federal courts. Whether Rule 16 is adequate even for its purposes is the subject of differences of opinion. But it does not purport to exhaust the prosecution's duty. MR. JUSTICE HARLAN apparently finds no inconsistency between proscription of the prosecution's knowing use or acquiescence in the use of perjured testimony [2] and Rule 16's silence on that subject. I find none in the requirement, recognized by this Court in *Brady* v. *Maryland, supra,* that the State apprise the defendant of information of the sort described herein, and the Rule's omission of such a requirement. My point relates, not to the defendant's discovery of the prosecution's case for purposes of preparation or avoidance of surprise, which is dealt with in Rule 16, but with the State's constitutional duty, as I see it, voluntarily to

[2] *Alcorta* v. *Texas,* 355 U. S. 28 (1957); *Napue* v. *Illinois,* 360 U. S. 264 (1959); *Mooney* v. *Holohan,* 294 U. S. 103 (1935).

disclose material in its exclusive possession which is exon-erative or helpful to the defense—which the State will not affirmatively use to prove guilt—and which it should not conceal. *Brady* involved neither the knowing use of perjured testimony nor acquiescence in its use. Never-theless, both the Maryland Court of Appeals and this Court concluded that the prosecutor's conduct in with-holding information material to guilt or punishment, in-formation which defense counsel had unsuccessfully requested, violated due process. Although this Court included in its statement of the controlling principle a reference to counsel's request—"We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecu-tion. . . ." [3]—I see no reason to make the result turn on the adventitious circumstance of a request. If the de-fense does not know of the existence of the evidence, it may not be able to request its production. A murder trial—indeed any criminal proceeding—is not a sporting event.

Mr. Justice Harlan, whom Mr. Justice Black, Mr. Justice Clark and Mr. Justice Stewart join, dissenting.

The disposition of this case, the product of three opinions, none of which commands the votes of a ma-jority of the Court, is wholly out of keeping with the constitutional limitations upon this Court's role in the review of state criminal cases. For reasons that follow, I dissent.

On the basis of the trial record, it would be difficult to imagine charges more convincingly proved than were those against these three youths for raping this teenage

[3] 373 U. S., at 87.

girl.[1] Following conviction, information came to light which seriously reflected on the sexual habits of the girl and on the stability of her character. These revelations were made the basis of a state post-conviction proceeding, premised on the claim that in failing to disclose these data at the time of trial the prosecution had been guilty of a deliberate suppression of material evidence and the knowing use of perjured testimony. The post-conviction judge found against those claims, but nonetheless ordered a new trial, holding that the data, which he deemed would have been admissible and useful to the defense, should have been disclosed by the authorities. The Court of Appeals of Maryland, holding as a matter of state law that this material was not such as to justify a new trial, reversed. This Court, without finding any constitutional flaw in the state proceedings, and indeed expressly recognizing that upon the facts as found by the state courts, petitioners' nondisclosure claim gives rise to no federal question under existing law, now returns the case to the Maryland Court of Appeals for what amounts to nothing more than reconsideration.

· The plurality and one of the concurring opinions urge entirely different reasons for remanding the case in this fashion, and will thus oblige the courts of Maryland to reconsider a series of wholly unrelated issues. The plurality opinion and my Brother White's concurring opinion have only two common denominators: neither can identify any federal basis for this disposition, and both

---

[1] "Consent" is of course the conventional defense in rape cases. In light of the forcible entry into the car occupied by the victim, the assault upon her companion, and her flight into the woods, it would have been extraordinary for the jury to have believed that this girl freely invited these youths to have sexual relations with her, still more that the petitioner John Giles, who was the first to pursue her into the woods (albeit allegedly not knowing that he was pursuing a female), refused the "invitation."

are concerned with questions which have been repeatedly considered by the state courts. Each of the three opinions requires discrete treatment, but I have concluded, for the reasons which follow, that none of them offers any basis on which the Court may properly return this case to the Maryland courts.

## I.

I turn first to the reasons advanced by the plurality opinion. The unusual disposition made of this case by the plurality is bottomed upon materials entirely outside the record before us, furnished to this Court after the case was submitted, under the leverage of inquiries put from the bench during the argument. The materials are two pre-indictment police reports, the Montgomery County Officers' Report and the Supplementary Offense Report. It seems to me entirely improper for this Court to "retry" state criminal cases in its own courtroom, and then to return them for reconsideration in light of materials "discovered" outside the record during that process. Even apart from that regrettable practice, the remand of this case is the more remarkable because the materials on which the plurality relies are not in any sense newly discovered. The fact is that these police reports have played a significant role throughout the state court proceedings. They were made available to defense counsel at the original trial stage. They were given to and considered by the trial judge at the time of sentence. And although demanded by the new defense counsel in the post-conviction proceeding, their production was denied under a state procedural rule which apparently was not contested in the state appeal, and which is in no way now questioned by this Court from a federal standpoint. In consequence, the ultimate rationale for the plurality's disposition of the case is itself specious.

The use now made of these police reports is equally unsatisfactory. The discrepancies which the plurality finds between these reports and the trial testimony relate to two episodes. First, the girl, Joyce, and her companion, Foster, apparently initially told the police that they were having sexual intercourse in their car when they noticed the presence of the other car, whereas at trial Foster intimated that he and the girl were simply sitting in the rear seat. He denied elsewhere that he and his friends had brought Joyce out to the spot to have sexual relations with her. Second, one of the police reports is construed to suggest that Joyce had said that John Giles did not penetrate her, whereas her trial testimony was that all three men had raped her. The plurality argues that these discrepancies, if known to the defense, might have been used to establish the girl's reputation for promiscuity, to attack the credibility of prosecution witnesses, and possibly to exonerate petitioner John Giles entirely. It even suggests that the defense might have shown a deliberate suppression of evidence or a conscious failure to correct perjured testimony.

The short answer to all this is, of course, that the record makes plain that defense counsel at the trial was given access to these police reports [2] and thus must be taken to have been aware of the very discrepancies of which the plurality now undertakes to make so much. There is no basis whatever in the evidence before us for the plurality's intimation that the reports seen by counsel may not have been those given to this Court or for its thinly veiled suggestion that in not making use of the supplementary report counsel may have been incompetent or worse.

---

[2] Counsel so stated three times at the post-conviction proceeding, twice under the judge's questioning. This colloquy has been reprinted in my Brother WHITE's opinion, *ante,* p. 82.

Beyond this, a more careful examination than the plurality has given these reports and the record will itself dissipate the aura of suspicion and conjecture with which this case has now been surrounded. The plurality first suggests that perjured testimony may have been knowingly utilized by the prosecution to establish penetration of the girl by John Giles. Joyce initially testified at a pretrial hearing that only Johnson and James Giles had intercourse with her.[3] Later in the same hearing she included John Giles, apparently with the explanation that she had first believed that rape requires emission as well as penetration. At trial she testified very specifically that John Giles had effected penetration. On cross-examination, she conceded that her first accounts both to the police and at the preliminary hearing indicated that only two men had intercourse with her. She again suggested that she had been confused. In contrast, the police officers testified at trial that Joyce had said in questioning on July 21 that John Giles had intercourse with her. The supposed inconsistencies among all these accounts were plain both to defense counsel and to the jury.[4]

Petitioners argued at the post-conviction proceeding that the police testimony was perjured, and that Joyce had initially said that John Giles did not attack her. They offered, in addition to Joyce's own admissions at trial, statements from petitioners' father, mother, and sister that a policeman had first mentioned only two assailants to them. In a deposition hearing, Joyce said that she did not recall ever conceding at trial that only two men had intercourse with her. Judge Moorman con-

---

[3] We do not have before us the transcript of the preliminary hearing. An uncontested account of Joyce's testimony was however given at the post-conviction proceeding. See Transcript of Record 270–272.

[4] Counsel made an extended effort to discredit Joyce's testimony based on the alleged inconsistencies in her various accounts. See Transcript of Record 62–64.

cluded that Joyce's terminological confusion adequately explained the supposed discrepancies with the police testimony. Although petitioners have not argued this issue here, the plurality now points to the supplementary report to suggest again that the police evidence might have been perjured, and remands for what it quite evidently hopes will result in another hearing on that issue.

It seems apparent that the references to this issue in the supplementary report are entirely equivocal. The report contains only three references to Joyce's statements on this question. First, Joyce is reported to have replied, when asked how many had intercourse with her, that "The bigger one [John] tried first, then the other two." Again, the statement is attributed to her, in the third person, that John "tried to have intercourse with her but was unable to do so." Finally, she is reported to have said that John Giles "tried to insert" but "could not get" an erection. The report indicates that John Giles was the first to begin to remove Joyce's clothing, that he kissed her, and that he "tried" for some 10 minutes.[5]

It must first be plain that although these references are brief and imprecise, nothing in them necessarily excludes the conclusion that John Giles achieved penetration, however slight. Further, it must be recognized that the form and language of the supplementary report indicate quite clearly that it was prepared rapidly, under the urgency of the events, and without any expectation that its every word would now be weighed and balanced. Little wonder that the plurality's diligent pursuit of uncertainty has unearthed phrases which, so it supposes, permit some room for ambiguity.

Finally, it must be remembered that in the report, at the pretrial hearing, and at the trial itself, the police,

---

[5] It is important to note that the supplementary report does not, contrary to the apparent suggestion in the plurality opinion, state that John Giles "failed to 'insert.' "

the witnesses, and even counsel employed interchange-ably various terms of very dissimilar meaning to describe the acts committed upon the girl by the defendants. The post-conviction proceeding court expressly found that Joyce for one was confused by this elusive termi-nology, and that this confusion explained any discrepan-cies in her various accounts of these events. This finding was not disturbed or even questioned by the Maryland Court of Appeals. Nonetheless, the plurality attempts to escape it with the suggestion, surrounded by cautious disclaimers, that it may possibly have been mistaken. The plurality offers three reasons for this suggestion. It first intimates that the finding may be mistaken because the State proffered this explanation only at the post-conviction proceeding. This is entirely unpersuasive; Joyce's confusion was apparent at least as early as the original preliminary hearing, and was not there offered by the State as an explanation, but instead became obvi-ous to those present simply from the terms of Joyce's testimony. The plurality next suggests that Joyce at trial expressed confusion only as to the names of her assailants, and not about this terminology. This is twice deficient: it ignores that the terms of Joyce's testimony were perfectly well known to the state courts which made and accepted the finding, and it is bottomed on an unrea-sonable construction of the testimony.[6]

Lastly, the plurality contends that Joyce is not shown by the supplementary report to have been confused. There are two obvious answers. First, this assumes that the report precisely reproduces the words used by Joyce herself to describe these events, and that these words

---

[6] Joyce did not simply suggest that she had been confused about the names of her assailants. Under defense counsel's persistent cross-examination she repeatedly affirmed that she was telling the full truth, and that she did not know "what I thought" at the time of her earlier accounts. Given her age and circumstances, this is scarcely improbable.

may therefore be sifted and weighed to establish Joyce's familiarity with this terminology. This is unsupported by the report itself, which contains no formal statements, and is instead an informal jumble of undigested information collected by the police as they conducted their investigation. At no point can the reader be entirely certain whether its words are the witness' or those selected by the police interrogators to digest the information given them. Finally, the plurality overlooks that there is uncontested testimony that Joyce was plainly and pertinently confused at the preliminary hearing. The plurality's speculation that she may or may not have been confused at one stage of this lengthy proceeding can scarcely vitiate the firm finding of the Maryland courts that she was confused at another and more crucial stage, and that this confusion explained any discrepancies in her accounts of these events. In sum, I find the plurality's oblique efforts to cast doubt on the finding of the state courts entirely unpersuasive.

Moreover, these references in the supplementary report must be viewed in light of the other police report furnished this Court, the Montgomery County Officers' Report. That report makes quite clear that Joyce indicated at the scene that John Giles "had entered her." [7] The plurality seeks to explain the terms of this report with two suggestions. First, it intimates that the report may be unreliable because it is a summary of Joyce's statements "immediately after the incident." I should have thought that it would therefore be all the more important. At most, the plurality's intimation is an acknowledgment of the weaknesses of both reports. Neither report was intended to serve as a formal and precise record; it is there-

[7] Montgomery County Officers' Report 1. The report indicates that Joyce said "two of the . . . males had entered her and . . . the third had tried but gave up when he saw lights coming." In the context of the other evidence the third man could only have been James Giles.

fore extraordinarily hazardous to pyramid, as the plurality has done, hypotheses upon strained constructions of the reports' most abbreviated references. This simply re-emphasizes the wisdom of the State's exclusionary rule, and the corresponding impropriety of the plurality's circumvention of that rule. Second, the plurality suggests that the report leaves unexplained the police testimony that Joyce had said that all three men had intercourse with her. This assumes first that the words "gave up" in the report indicate that Joyce meant that James Giles did not penetrate, when in light of the other accounts given by both James Giles and Joyce, it could only have meant that he did not reach emission. More important, the plurality overlooks that the only questions which have ever been even intimated about whether any of the three youths failed to penetrate the girl center entirely on John Giles, and this is a plain statement in the police reports that Joyce had informed the police at least once that John Giles penetrated her. The plurality opinion cannot, and does not, deny that this is the most unequivocal reference in either report to John's actions, and that it makes plain that Joyce reported that John had penetrated her. Given the ambiguity of the references to John Giles in the supplementary report, Joyce's clear statement in the Officers' Report that John Giles had penetrated, and the no less plain statements in the supplementary report from Joyce, James Giles and Johnson that James and Johnson also penetrated, I am again unable to understand how it can be thought that there might be some basis for the attribution of perjury on this score to the police witnesses.[8]

---

[8] The plurality's diversionary suggestion that Sergeant Duvall's testimony presents difficulties is wholly unpersuasive. His inexplicable failure to describe Joyce's statements to him served only to weaken the State's case, and certainly did not in any fashion prejudice petitioners. It offers no basis on which they would be entitled to relief.

The asserted discrepancies among the various accounts given of John Giles' participation by Joyce and the other prosecution witnesses have been forcefully argued at each stage of this case, they have been painstakingly considered by the state courts, and I can see no warrant for inviting those courts to examine the issue anew.

The plurality next suggests that the prosecution may also have been privy to the use of perjured testimony or guilty of a deliberate suppression of evidence in relation to what the girl and Foster were doing in the car just before their assailants came upon them. This is entirely insubstantial. Foster and the girl were never directly asked at trial, and did not volunteer, to describe what they had done while awaiting the return of their friends. They were not asked if they had intercourse. The question was only once even inferentially suggested. Foster was first asked "What did you three boys take Joyce out there for that night?" and replied "I told you we were going to meet some friends up there and go swimming." The next question was "You didn't take her out there to have sexual relations with her, yourself, did you?" and Foster replied "No." It would doubtless have been more forthright had Foster interjected that, whatever his original expectations, they had in fact had relations; nonetheless, his explanation was an adequate response to the precise question asked. In short, although the evidence was as to this point incomplete, it was, so far as it went, consistent with the police report.

I do not see how it can be suggested that the prosecutor's conduct in this instance was constitutionally vulnerable. First and foremost, the contents of the police reports on this episode were made available to the defense, and counsel elected to make nothing of them. Second, the omitted fact in Foster's testimony could not have had "an effect on the outcome of the trial." *Napue* v. *Illinois*, 360 U. S. 264, 272. Initially, it is very doubt-

ful that this evidence would have been admissible at trial. Under the law of Maryland, specific acts of misconduct are not admissible to impeach a witness' credibility. *Rau* v. *State,* 133 Md. 613, 105 A. 867. Further, since the evidence at trial was merely silent on these issues, and did not include inconsistent statements, this evidence presumably would not have been admissible on that basis to impeach the credibility of these witnesses. Finally, although Maryland permits the admission of evidence of a prosecutrix' general reputation for immorality, it does not permit evidence of specific acts of intercourse. *Shartzer* v. *State,* 63 Md. 149; *Humphreys* v. *State,* 227 Md. 115, 175 A. 2d 777. The Court of Appeals of Maryland has in this very case plainly said that "a prosecutrix cannot be asked whether she had previously had intercourse with a person other than the accused." *Giles* v. *State,* 229 Md. 370, 380, 183 A. 2d 359, 363. The evidence with which the plurality is concerned therefore cannot "reasonably be considered admissible," *Griffin* v. *United States,* 87 U. S. App. D. C. 172, 175, 183 F. 2d 990, 993, under the law of Maryland. Far more important from a federal standpoint, evidence of Foster's relations with the girl, even if admissible, could not have been substantially relevant to the principal factual issues at the trial. Its omission did not discolor the meaning of controlling facts, as did the episode involved in *Alcorta* v. *Texas,* 355 U. S. 28; nor did it measurably strengthen a witness' credibility, as did the one involved in *Napue* v. *Illinois,* 360 U. S. 264. It would at most have given the defense another inconclusive intimation of Joyce's promiscuity, and this could scarcely have sufficed to change the trial's outcome.

The plurality ultimately seeks to justify its disposition of this case in terms of the rules by which this Court has given recognition to the different roles played under the Constitution by federal and state courts. These efforts

arc entirely unpersuasive. In essence, the plurality has first brought these police reports into the case through an informal discovery rule of its own creation which flies into the face of an unassailed state rule which excluded the reports, and now has invited the state courts to reconsider the case unrestricted by the local rule and not confined to the "Constitution's relevant commands." This scarcely fits the plurality's professed objective to "minimize federal-state tensions." And plainly this course finds no support in cases in which the Court has remanded for further consideration in light of a supervening event. Nothing here is remotely analogous to the change in state law that occurred in *Bell* v. *Maryland,* 378 U. S. 226, or to the intervening judgments of this Court that took place in *Patterson* v. *Alabama,* 294 U. S. 600, and in *Dorchy* v. *Kansas,* 264 U. S. 286. What is now done is explicable only on the premise that this Court possesses some sort of supervisory power over state courts, a premise which of course traverses the most fundamental axioms of our federal system.

## II.

The rationale offered for remand by my Brother WHITE's opinion is equally unsatisfactory. At bottom, that rationale consists of the supposition that the presiding judge at the state post-conviction proceeding may possibly have misconstrued applicable Maryland law, and may therefore have improperly excluded testimony relevant to the mental condition of the prosecuting witness. My Brother WHITE does not suggest, as I think he cannot, that any of the rulings which he suspects to have been erroneous were deficient under any known federal standard. All of them at most involve, even under his premises, misapplications of Maryland law. Each of these rulings was plain on the face of the record presented to, and carefully considered by, the Maryland

Court of Appeals; all the materials pertinent to the evaluation of these rulings were before that court at the time of its review.

The court did not, of course, explicitly determine the various questions now posed, but it did, as my Brother WHITE acknowledges, examine the record to decide whether Joyce might have been suffering from mental illness, or whether she was otherwise incompetent as a witness. Such an examination must inevitably have obliged the court to assess the very rulings and restrictions which it must now reassess upon remand. Despite this, neither the majority nor the dissenting opinion below expressed any doubt that these rulings were entirely correct. At a minimum, a remand thus needlessly prolongs an already protracted case; unfortunately, it may also appear to endorse the substitution of the speculations of this Court on the content of state law for the conclusions of the State's highest court, as basis for the return of a case to the state courts for reconsideration.

In any event, the hesitations expressed by MR. JUSTICE WHITE's opinion about the scope of the evidence concerning Joyce's mental condition appear unwarranted on the record before us. The record makes plain that the court at the post-conviction proceeding permitted the admission of substantially more evidence on this issue than that opinion might be taken to suggest. First, the presiding judge permitted Dr. Connor, the attending physician, to state his diagnosis of Joyce's mental condition. In addition, Dr. Connor was allowed to indicate that he agreed with the diagnosis described to him by the consulting physician, Dr. Doudoumopoulis. Dr. Connor was not, as that opinion notes, permitted to describe that diagnosis, but the court supplemented its ruling with the statement to defense counsel that "I would admit it if you put it in the right manner." Both Dr. Connor and Dr. Doudoumopoulis were allowed in

a deposition hearing to state whether they had discussed Joyce's condition with various officials of Prince George's and Montgomery Counties. Further, the court permitted another psychiatrist, Dr. Solomon, to state, in reply to a hypothetical question asked by defense counsel, his opinion of the mental condition of a girl in Joyce's circumstances. In addition, Dr. Solomon was permitted to describe the basis for his views, to offer his opinion as to what her mental condition might have been some three months later (the interval before the trial in this case), and to state that a girl in these circumstances warranted a psychiatric examination. Dr. Solomon was prevented from speculating only whether this condition might have affected the girl's credibility as a witness, an issue, the court noted, which is for the jury, and not an expert witness, to determine. Finally, petitioners adduced very substantial evidence of Joyce's sexual history, all of which was pertinent to the court's determination whether she might have been suffering from mental illness.

Perhaps more evidence of Joyce's mental condition, and of the knowledge of Montgomery County authorities of that condition, could conceivably have been introduced; but it is true of all criminal prosecutions, federal and state, that some fragments of fact broadly pertinent to the issues of the trial do not reach the record. In any event, the petitioners themselves have apparently never challenged any of these rulings either before the Maryland Court of Appeals or in this Court. I can find no basis on the record before us for remanding this case simply in the hope that rulings of state law may now be held to have been improper, and thus that unknown additional evidence, which may or may not be pertinent and substantial, may then be admitted. This practice is warranted neither by the facts of this case nor by the role given to this Court by the Constitution in the review of state criminal convictions.

### III.

My Brother FORTAS' proposed resolution of the case is, with great respect, no more satisfactory, although he would, to be sure, base its disposition upon an asserted federal question. His reasoning, as I see it, rests at bottom upon quite fundamental objections to the character and balance of our adversary system of criminal justice. Neither those objections nor the conclusions which stem from them form any part of the disposition made of this case, in which he joins; it would accordingly be inappropriate for me to respond in more than relatively summary fashion. I content myself, therefore, with outlining the reasons why I cannot subscribe to my Brother FORTAS' approach.

As I understand him, my Brother FORTAS believes that state prosecuting officials are compelled by the Fourteenth Amendment to disclose to defense counsel any information "which is material, generously conceived, to the case, including all possible defenses." This would include all information which is "exonerative or helpful." This standard would demand markedly broader disclosures than this Court has ever held the Fourteenth Amendment to require. The Court has held since *Mooney* v. *Holohan,* 294 U. S. 103, that a State's knowing use of perjured testimony denies a fair trial to the accused. *Mooney* has been understood to include cases in which a State knowingly permits false testimony to remain uncorrected. *Alcorta* v. *Texas,* 355 U. S. 28; *Napue* v. *Illinois,* 360 U. S. 264. The standard applied in such cases has been whether the testimony "may have had an effect on the outcome of the trial." *Napue* v. *Illinois, supra,* at 272. These cases were very recently followed and applied in *Miller* v. *Pate, ante,* p. 1. Apart from dicta in *Brady* v. *Maryland,* 373

U. S. 83, the Court has never gone further.[9] Nor, in my view, does the Constitution demand more. This standard is well calculated to prevent the kinds of prosecutorial misconduct which vitiate the very basis of our adversary system, and yet to provide a firm line which halts short of broad, constitutionally required, discovery rules. It both guarantees the fundamental fairness of state criminal trials, thereby satisfying in full the requirements of the Fourteenth Amendment, and preserves intact the States' ultimate authority for the conduct of their systems of criminal justice. None of these advantages adheres to the standard suggested by my Brother FORTAS. His reasoning must inevitably result in the imposition upon the States through the Constitution of broad discovery rules. Those rules would entirely alter the character and balance of our present systems of criminal justice.

The extraordinary breadth of the standard apparently urged by MR. JUSTICE FORTAS becomes more plain when that standard is measured against Rule 16 of the Federal Rules of Criminal Procedure, applicable in federal criminal trials.[10] Discovery under Rule 16, even as now

---

[9] I cannot agree that this Court in *Brady* extended *Mooney* in any fashion. The language in *Brady* upon which my Brother FORTAS relies was quite plainly "wholly advisory." *Brady* v. *Maryland, supra,* at 92 (separate opinion of WHITE, J.).

[10] In substance, Rule 16 provides that upon the motion of a defendant a court may permit the defendant to inspect and copy "statements or confessions made by the defendant," the results of physical or mental examinations and of "scientific tests or experiments," and the defendant's testimony before a grand jury. Further, the court may, upon a defendant's motion and upon a showing of materiality and reasonableness, permit the defendant to inspect and copy or photograph "books, papers, documents, tangible objects, buildings or places, or copies or portions thereof . . . ." The Rule expressly does not authorize the discovery or inspection of "internal

amended, is restricted by a number of carefully drawn limitations, each intended to "guard against possible abuses." Notes of the Advisory Committee on Rules, 39 F. R. D. 176. The defendant is permitted only to obtain certain categories of materials, and he must in each case first move the court for their production. These limitations fall far short of the standard urged by my Brother FORTAS. Under his view the information obtainable by the defendant could not be restricted by its character or source; failure to disclose could be justified, *post hoc,* only if the information cannot be deemed "material," generously judged. Nor could the defendant be obliged to demand disclosure; as my Brother FORTAS' opinion emphasizes, the burden must instead be placed upon the prosecutor, on threat of subsequent reversal of any conviction, spontaneously to proffer all that might prove "helpful" to the defense. The effect which the rule urged here would thus have on this federal and similar state discovery rules would be entirely unlike that of *Mooney* and the cases which stem from it. *Mooney* simply imposes sanctions upon specified forms of prosecutorial misconduct; MR. JUSTICE FORTAS' rule would in contrast create wide constitutional obligations to disclose which, whether operative before or during trial, would entirely swallow the more narrow discovery rules which now prevail even in federal criminal trials.

---

government documents made by government agents" in connection with the case, or of statements "made by government witnesses or prospective government witnesses . . . to agents of the government . . . ." Other portions of Rule 16 permit a court to make such disclosures conditional upon disclosures by the defendant to the Government, to prescribe the time, place, and manner of discovery, and to make suitable protective orders. Finally, the Rule creates a continuing duty to disclose additional similar materials obtained after compliance with an order issued under the Rule, and permits the imposition of sanctions for failure to satisfy that duty.

Issues of the obligatory disclosure of information ulti-
mately raise fundamental questions of the proper nature
and characteristics of the criminal trial. These ques-
tions. surely are entirely too important for this Court to
implant in our laws by constitutional decree answers
which, without full study, might appear warranted in a
particular case. There are few areas which call more for
prudent experimentation and continuing study. I can find
nothing either in the Constitution or in this case which
would compel, or justify, the imposition upon the States
of the very broad disclosure rule now proposed.

### IV.

The unarticulated basis of today's disposition, and of
the disparate reasons which accompany it, is quite evi-
dently nothing more than the Court's uneasiness with
these convictions, engendered by post-trial indications of
the promiscuity of this unfortunate girl. Unable to dis-
cover a constitutional infirmity and unwilling to affirm
the convictions, the Court simply returns the case to the
Maryland Court of Appeals, in hopes that, despite the
plurality's repeated disclaimers, that court will share the
Court's discomfort and discover a formula under which
these convictions can be reversed. The Court is unable
even to agree upon a state law basis with which to explain
its remand. I cannot join such a disposition. We on
this bench are not free to disturb a state conviction
simply for reasons that might be permissible were we
sitting on the state court of last resort. Nor are we free
to interject our individual sympathies into the adminis-
tration of state criminal justice. We are instead con-
strained to remain within the perimeter drawn for this
Court by the Constitution.

I cannot find a tenable constitutional ground on which
these convictions could be disturbed, and would therefore
affirm the judgment of the Court of Appeals of Maryland.