Clarence COLEMAN, Petitioner,

v.

Ernest MAXWELL, Warden, Respondent.

Civ. A. No. 7707.

United States District Court
S. D. Ohio, E. D.

Aug. 17, 1967.

Civ. A. 66-C-80.

William J. Davis, Columbus, Ohio, James R. Willis, Cleveland, Ohio, for petitioner.

William B. Saxbe, Atty. Gen. of Ohio, Columbus, Ohio, Leo Conway, Asst. Atty. Gen., for respondent.

## OPINION AND ORDER

KINNEARY, District Judge.

This is an application for a writ of habeas corpus in which petitioner seeks relief pursuant to Title 28, United States Code, Section 2241. After a trial by jury in the Court of Common Pleas of Cuyahoga County, Ohio, defendant was found guilty of receiving and concealing stolen property. The judgment of conviction was affirmed by the Court of Appeals for the Eighth Judicial District of Ohio. Following his conviction, petitioner filed a motion for new trial on the ground of newly discovered evidence. This motion was denied, and that denial was affirmed on appeal by the Court of Appeals for the Eighth Judicial District of Ohio. On appeal to the Supreme Court of Ohio, the affirmance of the new trial motion was consolidated with the appeal from the affirmance of the judgment of conviction, and together the cases were dismissed for lack of "a substantial constitutional question."

The issues raised in the present Petition have been raised previously by petitioner in his appeals in the various Ohio courts in which he has appeared. As stipulated by the parties, these issues are:

1. Was petitioner's conviction the result of the use by the prosecution of the fruits of an illegal search and seizure?

2. Was petitioner denied the due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution because the prosecution refused to turn over to defense counsel any statement of the witness Chris Carter made to police officers?

The facts surrounding the arrest, indictment and trial of petitioner are as follows:

On August 31, 1964, a new, combination radio, television and phonograph was stolen from Industrial Television and Radio Service, 990 East 105th Street, Cleveland, Ohio. This set was removed by three men from the owner's van truck while it was parked on the side of the store.

On September 4, 1964, Chris Carter, a known narcotics addict with a history of prior felony convictions, was arrested in connection with this theft. At the time of his arrest, Carter went into what has been called "withdrawal" because of his inability to obtain narcotics. When questioned during this "withdrawal" period on September 4 and 5, 1964, Carter denied any knowledge of the theft. However, after being identified in a lineup on the afternoon of September 5, 1964, he admitted his participation in the crime.

On the morning of September 8, 1964 (after an intervening Sunday and holiday), Carter furnished a written statement concerning the crime in which he also identified the petitioner, Clarence "Sonny" Coleman, as the person to whom the set was sold. With this information, Detective Richard Dierker of the Cleveland Police Department obtained from the Cleveland Municipal Court a warrant to search petitioner's home.

After obtaining the warrant, Detective Dierker and Detective Bert Weglicki went to petitioner's residence at 1091 Thornhill Drive, East Cleveland, Ohio, where they met Detectives Kane and Janero who had been ordered to maintain an observation of the residence. Detectives Dierker and Weglicki gained entrance to the house when they informed petitioner's common law wife, Gloria Mae Nicholson, that they had a warrant to search the premises. They were told by Miss Nicholson that petitioner was not at home but that she would attempt to contact him by telephone. In response to such a call, petitioner returned home

and was informed that the police officers had a search warrant.

Detectives Dierker and Weglicki noted the presence of the "Olympic Combination 23″ TV"—the item for which the search was authorized—immediately upon being invited into the house. However, after petitioner returned home and was informed of the search warrant, the officers still conducted a search of the premises "to see what else could be found." During this further search, petitioner told the officers that he had bought the television, and he attempted to locate the purchase receipt. He was, however, unable to do so. A repair receipt for the television was produced by petitioner as an apparent attempt to exculpate himself by substantiating his story that when he purchased the set it was scratched and not in working order. The receipt showed that the set had been repaired by L. C. Radio-Television, 1091 East 105th Street, on September 2, 1964.

With their search completed, the officers arrested petitioner for "investigation" in connection with the receiving of stolen property. When interrogated at police headquarters, petitioner denied any implication in the crime. Subsequent to his arrest and interrogation, the Cuyahoga County Grand Jury indicted petitioner in two counts for receiving and concealing the television set and for receiving and concealing a portable typewriter (this article was seized in petitioner's home during the September 8 search for the television set).

Prior to trial, petitioner moved for the suppression of articles seized in the search of his residence on September 8, 1964, and of all statements made by him during the course of such search. This motion was granted because the premises at 1091 Thornhill Drive, East Cleveland, Ohio, was beyond the jurisdiction of the court which issued the search warrant. Because of the suppression of the typewriter which had been seized in the search, the prosecution moved for and was granted leave to dismiss the second count of the indictment.

At petitioner's trial the prosecution produced as witnesses Marshall Freeman and Chris Carter. Freeman testified that he was doing business as L. C. Radio-Television Service and that he had been called out to 1091 Thornhill Drive to repair a model K–965 Olympic television set on September 1, 1964. This set was repaired at his shop and returned to a "Mr. Coleman" at the Thornhill Drive address on September 2, 1964. The original of the receipt for this repair was admitted in evidence, and in addition to corroborating the oral testimony of Freeman, it showed that the repair price was $29.96.

Carter testified that he and two men named Pike and Dozier removed the television set from the truck at Industrial T. V. and that they put it in the basement of the apartment building in which one of the men lived. He further stated that they contacted petitioner who came to the building to see the set which was still in its original packaging. Petitioner agreed to buy the set, and it was brought to his home at 1091 Thornhill Drive. The parties agreed on a price of about $175.00, to be paid half in cash and half in heroin.

When the set was delivered to petitioner's home and uncrated, it was discovered that it did not function. Carter attempted to get a repairman out to the house, but he was unsuccessful. One of the other men involved in the theft contacted a repairman who came out to the house. After the arrival of the repairman, Carter and his two accomplices left. They returned the next day, and petitioner informed the men that it had cost him $30.00 to have the set repaired and that he was deducting $30.00 from both the cash half and the heroin half of the purchase price. The men then received $60.00 in cash and a little more than $60.00 worth of heroin. When asked what he told petitioner about the television set, Carter stated that he told him that it was stolen.

The cross-examination of Carter by defense counsel dealt primarily with Carter's prior criminal record, his daily

thefts to support his "habit," his initial denials of his part in the theft of the television set, his later admission and statement concerning the theft and sale of the set, and the question of whether Carter had been promised anything by the police or prosecutor for his testimony. At the end of a searching cross-examination of this witness, petitioner's attorney moved the Court to direct the prosecutor to produce copies of all statements made by Carter so that he might determine if his testimony at trial was consistent with what Carter had stated on previous occasions. This motion was denied, and Carter was excused subject to recall which never occurred.

*Was Petitioner's Conviction the Result of the Use by the Prosecution of the Fruits of an Illegal Search and Seizure?*

This contention is based on the allegations that after the completion of the trial petitioner discovered for the first time that the prosecution had in its possession the customer's copy of the repair receipt from L. C. Radio-Television and that it was through the use of this copy that the prosecution was able to trace the repair of the set and produce the witness Freeman.

Petitioner alleges that the police officers obtained possession of the customer's copy of the receipt during the September 8 search of his residence and that he did not know of such seizure because it was not noted on the return inventory of the search warrant. He further asserts that even if it was not so noted it was suppressed as evidence as part of the trial court's ruling suppressing for use as evidence all articles seized pursuant to that warrant.

While respondent admits that the police officers obtained possession of the customer's receipt at the time of their search on September 8, 1964, and that it was not noted on the inventory, he asserts that the receipt was voluntarily turned over to the detectives by petitioner and was not part of the articles suppressed as evidence. Thus, respondent contends that even if the officers went to L. C. Radio-Television and asked to see the original receipt and gave Freeman the number of the copy in their possession, they were not using illegally seized and suppressed evidence.

In the instant case it is not necessary to reach the issue of whether or not the customer's copy of the receipt was part of the evidence seized at his residence and suppressed by the ruling of the trial court. Respondent has established sufficiently the fact that the police officers received knowledge of the repair of the television by L. C. Radio-Television prior to the time they searched petitioner's home on September 8, 1964. This fact was established through the testimony of Detectives Dierker and Weglicki at the hearing held before this Court. Both officers stated that when Chris Carter admitted the theft he told them that he had sold the set to petitioner and that it was not working. Carter also informed them that a repairman from L. C. Radio-Television came out to repair the set and that he knew the name of the repair shop because he read the inscription on the repairman's shirt and on the truck he was driving.

This testimony was in no way controverted by the petitioner. What petitioner did in an attempt to explain away such testimony was to suggest that if the identity of the repairman was known prior to the search of his home that fact should have appeared in Chris Carter's statement and in the affidavit for the warrant to search the Thornhill Drive address. However, petitioner offered no cogent reason as to why that fact had to be in either Carter's statement or the affidavit for the warrant. While it might be said that it should have been in Carter's statement since this was part of what he told the officers, it cannot be said that it had to be in there if it existed inasmuch as the written statement of Carter is by no means a transcription of everything he told the police officers. Also, it is no answer to the testimony of the officers for petitioner to say it should have appeared in the affidavit for the

search warrant. While it might have been useful in showing probable cause, many other things which Carter told the officers about petitioner might also have been useful in showing probable cause. If Detective Dierker felt that he had enough facts to establish probable cause and he received a warrant on the basis of the affidavit as drawn, then it is safe to say that there was no necessity known to him for inclusion in the affidavit of the identity of the repairman.

■ Thus, even if it were assumed that the customer's copy of the repair receipt was illegally seized and thus became suppressed evidence, there was such a sufficiently independent source from which the witness Freeman and the original receipt could have been produced without violating the constitutional proscription on the direct or indirect use of illegally seized evidence. Ker v. State of California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1962); Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939); Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). Even though the use of assumedly tainted evidence may have facilitated the discovery of Freeman and the original receipt, respondent has sufficiently established that the use of such evidence was not necessary for that discovery. Therefore, petitioner was not deprived of the due process of the law through the use by the prosecution of the fruits of an illegal search and seizure.

*Was Petitioner Denied the Due Process of Law as Guaranteed By the Fourteenth Amendment to the United States Constitution Because the Prosecution Refused to Turn Over to Defense Counsel Any Statement the Witness Chris Carter Made to Police Officers?*

It is petitioner's contention that it was error for the trial court to refuse to order the prosecution to produce any statements made by Carter so that defense counsel could examine them for matters which might be inconsistent with that witness's trial testimony or which might be beneficial to the defendant. Initially, this basis of error was asserted in this Court on the theory that the ruling in Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957), [that in a federal criminal prosecution the government must turn over to defense counsel for inspection upon request statements made by witnesses touching the events as to which such witnesses testified at trial] was a decision based on constitutional requirements and such requirements are also applicable to state criminal prosecutions by virtue of the due process clause of the Fourteenth Amendment to the United States Constitution. However, during the course of the proceedings before this Court, respondent produced the only written statement made by Carter to the police, and this has occasioned a change in petitioner's basic line of attack. Petitioner now predicates his claim of constitutional error in his conviction on the allegation that this statement contained matters of material benefit to him, and thus, he was denied due process of law under the determination in Brady v. State of Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) that suppression by the prosecution of evidence beneficial to an accused violates due process. The statement which now has been produced is attached hereto as Appendix A.

■ The right to request and be granted a turnover of pretrial statements of witnesses in federal criminal prosecutions was an allowance made by the Supreme Court of the United States on the basis of that Court's supervisory power over the administration of such prosecutions. Palermo v. United States, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959); Jencks v. United States, supra. This was not a determination that the turnover was in compliance with any sort of constitutional right. Thus, contrary to petitioner's assertion, there is no constitutional right to a blanket turnover order in federal criminal prosecutions which is applicable to state crimi-

nal prosecutions through the due process clause of the Fourteenth Amendment to the United States Constitution.

As to petitioner's other contention of the prosecution's suppression of favorable evidence upon his request, a reading of Chris Carter's written statement in conjunction with his trial testimony reveals two differences in content:

1. In his statement, Carter said that he imagined that petitioner knew the set was stolen, and in his trial testimony he said petitioner was told the set was stolen (R. 66);

2. In his statement, Carter gave the agreed price of the set as $150.00 and the deduction for the price of the repair as $15.00 from the cash and $15.00 from the heroin. In his trial testimony he gave the agreed price as $175.00 and the deduction of $30.00 from the cash and $30.00 from the heroin. (R. 68, 73)

■ The second discrepancy is not the type of evidence material to the guilt of an accused which was suppressed in *Brady* in that it is not relevant to the establishment or negation of the essential elements of the offense charged. Rather it is evidence which may be useful for impeachment purposes and which is not considered as directly material to the guilt of an accused so that its suppression would amount to a denial of due process. Giles v. State of Maryland, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967).

In view of the fact that scienter is an essential element of the offense, Ohio Rev.Code, Section 2907.30, the first discrepancy involves a subject which is material to the guilt of the accused. However, because the prior written statement on scienter is obviously a conclusion based on underlying facts (which could have included someone telling petitioner the set was stolen) the statement itself is not material to petitioner's guilt. Thus, both discrepancies fall in the category of evidence which may be useful for impeachment purposes.

While statements showing prior inconsistencies do not have a direct bearing on the establishment or negation of the essential elements of an offense, they are nonetheless material to the guilt of an accused. Such statements may be determinative of whether or not the entire fact finding process is operating effectively since matters of credibility are dispositive of the question of whether or not a witness who may be establishing essential facts directly material to the guilt or innocence of an accused is testifying truthfully. As has been pointed out by the Supreme Court, a "jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence." Napue v. People of State of Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).

■ The Court is compelled to observe that the due process clause of the Fourteenth Amendment in proscribing suppression of favorable evidence directly material to guilt or innocence of an accused or indirectly material as reflecting on the credibility of a witness does not envision such proscription to apply only where such suppression is uncovered by fortuitous circumstances such as an accused's vigilance in a co-defendant's case as in *Napue* or the unsolicited generosity of a respondent in a federal habeas corpus proceeding as in the instant case. What is required by that amendment is the solicited generosity of the prosecution at the trial of an accused. Certainly, due process of law in its solicitousness for the rights of both the public and those unjustly accused, would not have one unjustly accused stand trial and be convicted on the basis of evidence which is later accidently discovered to be of possible fabrication when such matters could have been submitted initially to the fact finders for their consideration. In view of the fact that the due process clause is violated by both guileful and guileless suppression, what is required is an enlightened approach by prosecutors to turn over, on request, statements of witnesses who have testified on behalf of the prosecution which

are relative to the subject matter of such testimony in state criminal prosecutions unless there is interposed some counterbalancing factor such as the state's interest in preserving certain matters confidential.

Nonetheless, this Court has now had a chance to consider the requested statement as it applies to the credibility of the witness Carter. The resultant comparison of that statement with the witness's trial testimony reveals the two differences in content which have been stated above. In view of the matters in evidence before the jury as to Carter's many prior felony convictions and his prior inconsistent statements concerning his own guilt, the constitutional error in this case relating to the credibility of that witness was harmless. The discrepancy of $30.00 in purchase price of the set and the conclusory, as opposed to factual, testimony on scienter are miniscule when viewed in the context of all of the matters bearing on Carter's credibility which was produced at trial. Thus, the petitioner was not prejudiced by the constitutional error since it was harmless beyond a reasonable doubt, Chapman v. State of California, 386 U. S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), and he is entitled to no relief.

Whereupon, the Court determines that the petition for a writ of habeas corpus is without merit, and therefore it is denied.

### APPENDIX A

Criminal Investigation Bureau

September 8, 1964

The following is the statement of CHRIS CARTER, (C) Age 41—Single, residing at 1899 E. 71st street, Cleveland Ohio, Phone—None, regarding his arrest on the charge of GRAND LARCENY.

CHRIS CARTER: You are arrested and may be charged with the crime of Grand Larceny, and the law gives you the right to make a statement which may be used against you at the time of your trial in court. Understanding this, do you care to make a statement telling us the truth about the facts that led to your arrest?

A. Yes:

On August 31, 1964, some time in the afternoon, I was with Pike and a guy named Dozier. They told me they had a TV set and all we had to do is go get it.

I got together with them and we went out to where the truck was. And so I went in the truck, and Dozier went in the truck and we got the set out, and after we got it the guys decided who they wanted to sell it to. All the guys are narcotic users, you know, so we decided to sell it to some dealer, so we showed it to Sonny Coleman. He made a deal, half dope, and half cash, which was $75.00 cash, and $75.00 worth of dope, the set was defective, it had a defective condenser, and the repairman charged $29.00 to fix it, so Sonny Coleman reduced $15.00 off of the cash and $15.00 off of the dope. * * *

Q. Do you know any one in authority at Industrial T.V., located at 990 E. 105th street?

A. No

Q. Did you, or any one else have permission to take this TV in the manner in which it was?

A. No

Q. Do you know Pike's, or Dozier's real names?

A. I don't know there real names

Q. Where did you received the cash and dope from Coleman?

A. At his house on Thornhill drive.

Q. Where did he receive the television?

A. We brought it out to him

Q. Did Coleman know the TV you sold him was stolen?

A. I imagine he did.

Q. Is there anything else you care to say at this time?

A. No

Q. Have you read the above statement and is it true?

A  YES        SIGNED Chris Carter.

WITNESS Bert Weglicki, Det. 1266.

Richard Dierker, Det. 1546.

Marini, Det. 9:10 A.M.