Albert Conrad **MARES**, Petitioner,

v.

The **UNITED STATES** of America,
Respondent.

**UNITED STATES** of America,
Plaintiff,

v.

Albert **MARES**, Defendant.

Civ. A. No. C–1049.

Crim. A. No. 66–CR–81.

United States District Court
D. Colorado.

Jan. 9, 1969.

Harry G. Titcombe, Jr., Denver, Colo., for petitioner.

Lawrence M. Henry, U. S. Atty., and David A. Fogel, Asst. U. S. Atty., Denver, Colo., for respondent.

## ORDER

WILLIAM E. DOYLE, District Judge.

The petitioner herein has filed a motion for new trial and a supplemental motion for new trial. He was convicted in this Court on or about October 3, 1966, in case No. 66–CR–81. The charge was robbery of a savings and loan institution. Subsequently, this conviction was affirmed by the Circuit Court, 383 F.2d 811 (1967), cert. denied, 390 U.S. 961, 88 S.Ct. 1060, 19 L.Ed.2d 1157 (1968).

Petitioner is now confined in the United States Penitentiary at Marion, Illinois, and this present effort to obtain a new trial is based upon newly discovered evidence. He raises various other grounds, none of which can be considered at this late date. An attorney was appointed to represent him, and an evidentiary hearing has been held. The matter now stands submitted.

Petitioner's motion alleges that on or about April 4 and continuing through April 7, 1966, the Federal Bureau of Investigation conducted an investigation of a robbery of the Key Savings and Loan Association in Denver, and obtained a statement from a witness who was present in the shopping center where the Key Savings and Loan Association is located at about the time of the alleged robbery; that this witness saw two men run from the savings and loan association at or about the time of the robbery and jump into a pickup truck; and that he believes that these were the men who had robbed the bank. Petitioner further alleges that the Government knew of the evidence, but failed to disclose it to the petitioner and also failed to subpoena the witness. It is further alleged that the testimony of the witness would have shown that petitioner could not have committed the crime. A further allegation in the motion is that this information was brought to the attention of petitioner's attorney, although it does not specify the date the notice was given.

An Order to Show Cause was issued to the Government and after the filing of a return and a traverse, the matter was set down for evidentiary hearing. It was treated not only as a motion for new trial, but also as a collateral attack on the judgment under 28 U.S.C. § 2244. Hence, a separate civil action was docketed, the matter being allowed to proceed in forma pauperis. At the hearing the specified witness was called on behalf of petitioner and was examined extensively. Testimony of all other witnesses who might have information was received. Finally, affidavits from the then Assistant U. S. Attorney as well as the lawyer who represented petitioner at the trial in 66–CR–81 were filed.

The robbery here in question occurred at about 12:00 o'clock on April 4, 1966. The two perpetrators had worn knitted ski masks and although described gen-

erally by the bank employees, were not positively eye witness identified. Thus the evidence at the trial was largely circumstantial.

At the hearing which was held on November 29, 1968, Ruel F. May, who was called on behalf of the plaintiff, testified that on April 4, 1966, he resided near the Alameda Shopping Center and that he was then on welfare. He stated that he usually went to the shopping center at 11:30 and that he walked by the Key Savings and Loan Association. His identification was sketchy. He said that he saw two men coming out of the institution; that one of them had pocks on his face and the other one was slim and tall. He was unable to identify the petitioner or his brother, who was his co-defendant and who was then in Court.

May was interviewed at the time by the FBI as to whether he had seen a truck parked in the vicinity (a small truck was allegedly used in the robbery). It would seem that when the witness first talked to the FBI he did not mention that he had seen two individuals walk out of the bank. Despite persistent questioning by both the defense attorney and the United States Attorney at the time, little information was obtained from him. He did not mention to the FBI at the time of this original questioning or to the U. S. Attorney later anything about seeing two men come out of the bank. The FBI reduced his meagre statement to writing and a copy of this is appended to this Order. Apparently it was prepared on April 12, 1966, and its purport is that he was at the shopping center on April 4, 1966, and he remembered the day because he later heard that a robbery had occurred. A photograph of a 1950 Chevrolet pickup truck was shown to him and he stated that he saw such a truck parked behind the locksmith's building at the shopping center on April 4, 1966. The United States Attorney, after interviewing this witness, decided that his testimony was so inconsequential as to not warrant calling him.

At our hearing it was brought out that notice was given to petitioner's lawyer at the second trial of Arthur Mares, co-defendant of the petitioner, as to the existence of a witness who had not been called. On the basis of this, it was suggested that the then attorney for petitioner file an affidavit as to what was said to him, and that Richard T. Spriggs, the then Assistant U. S. Attorney (who is no longer present within this District), be allowed to also file an affidavit giving his version. These two affidavits were filed and are appended to the present Order.

It appears from the affidavits that the conversation between Spriggs and Eugene Deikman, petitioner's lawyer, occurred at the *first* Arthur Mares trial which preceded the trial of petitioner. Petitioner was tried on the 29th day of September 1966, whereas Arthur Mares was tried on the 20th day of September 1966. Deikman's affidavit makes this clear and also reflects that he approached Spriggs during a recess in the Arthur Mares trial and tried to provoke him to reveal the balance of his case by making joking reference to one of the other witnesses. He asked him "Do you have any more unreliable witnesses like Jewell Boswell?" Spriggs replied, according to Deikman, "If you think she is unreliable, you ought to see the man who claims he saw the Mares brothers get away in a white pick-up truck." Deikman asked him if he was going to produce this witness and Spriggs replied that he regarded him as unreliable because he was suspiciously eager to testify. The version that Spriggs gives in his affidavit is somewhat different. He does confirm that the conversation occurred during the first Arthur Mares trial starting September 20, 1966. He also states that he met with the witness May before or during the trial and showed him a photograph of the truck used in the robbery. May looked at the photograph and said that it was not the same truck he had seen, whereupon Spriggs excused him. Spriggs goes on to say that during the *first* trial of Arthur Mares, Deikman

asked him who the witness Ruel F. May was and what he was to testify to in that May's name appeared on a prospective list of witnesses furnished to Deikman at the commencement of the trial. Spriggs then states that he told Deikman that May was a person who had seen a truck at the shopping center, but that they had determined that it was not the same truck used by the Mares and thus did not intend to call him as a witness. Spriggs further stated that he never had any information from any source that there was any witness who "had seen the robbers leaving the bank." He adds that there, is nothing in the FBI report that would suggest that anyone "viewed the robbery in progress."

Undoubtedly, some conversation occurred between Deikman and Spriggs during the course of the first Mares trial. Whether Spriggs said something about the witness seeing the robbers escape in a white pickup truck does not appear to be pivotal, although it can scarcely be argued that the petitioner did not have notice of the existence of a potential witness who was present at the scene at the time of the alleged robbery or some thirty minutes prior to it (as it turns out.)

■ The first question to be determined is whether the judgment should be vacated or a new trial granted because of the withholding of evidence. From a consideration of the entire record, including the testimony of FBI Agent Yates, it is clear, and the Court so finds, that neither the FBI nor the Government had any notice that the witness May would state that he saw some men come out of the bank. Consequently, there was no withholding of material information. The only fact which was then within the knowledge of the U. S. Attorney was the statement of the witness May that he had seen a truck at the scene, which truck coincided with a picture of that used in the robbery, but that he saw a board or piece of wood in the rear. There was nothing here which could aid the defendants in their defense. Furthermore,

Deikman who was petitioner's attorney, as well as the attorney for Arthur Mares, was aware of May before the commencement of the trial of this petitioner.

We are unable to perceive any violation of the Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) —Giles v. Maryland, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967) doctrine. The petition seeking post-conviction relief is denied.

Petitioner's or movant's further contention is that the testimony of the witness May satisfies all of the requirements of newly discovered evidence. We disagree with him. The testimony of May is inconsequential and irrelevant. Admittedly, he brought the information to the attention of the U. S. Attorney, regarding having seen two men, on the date of our evidentiary hearing. The *time* that he now says that he saw the men does not coincide with the time of the alleged robbery. Secondly, he does not say that he saw the men he did see *run* out of the bank, and thus his testimony is wholly and entirely reconcilable with the evidence presented by the Government at the trial. Thus petitioner or movant has not substantiated the allegation of his petition. This allegation reads as follows:

"On or About April 4 through April 7, 1966, The Federal Bureau of Investigation had occassion to take a statement from a man unknown to petitioner, pertaining to the investigation of the Robbery of the Kay Savings and Loan Association, Located in the Alameda Shopping Center, said statement was that he had seen two men run from the Savings and Loan Association on April 4, 1966 around noon and jump in a pick-up truck, which he believed were the men who robbed the Key Savings and Loan Association."

■ The motion for new trial on the ground of newly discovered evidence is not favored and should be granted only with great caution. Casias v. United States, 350 F.2d 317 (10th Cir. 1965). In Wion v. United States, 337 F.2d 230 (10th Cir. 1964), our Circuit Court fur-

ther elaborated the rules governing the granting of new trials on the ground of newly discovered evidence as follows:

"The defendant in a criminal case is not entitled to a new trial on the ground of newly discovered evidence unless that evidence was discovered after the trial and the defendant exercised diligence prior to trial; that the evidence is material to the issues involved and not merely cumulative or impeaching; and that on a new trial the newly discovered evidence would probably produce an acquittal. Ferina v. United States, 8 Cir., 302 F.2d 95, cert. denied Cardarella v. United States, 371 U.S. 819, 83 S.Ct. 35, 9 L.Ed.2d 59; Connelly v. United States, 8 Cir., 271 F.2d 333, cert. denied Caudle v. United States, 362 U.S. 936, 80 S.Ct. 755, 4 L.Ed.2d 750; Long v. United States, 10 Cir., 139 F.2d 652; Johnson v. United States, 8 Cir., 32 F. 2d 127." (337 F.2d at 231).

■ The instant petition and evidence falls far short. It fails to satisfy a single requirement of newly discovered evidence. It must fail as a belated and abortive effect to find some possible basis for attacking the instant judgment.

The motion for a new trial is denied.

The petition in Civil Action No. C–1049 is denied and that cause is dismissed.

## APPENDIX

### AFFIDAVIT

The undersigned Richard T. Spriggs, being duly sworn, hereby states, deposes and swears:

That from January, 1965 to November, 1968, I was employed as an Assistant United States Attorney in and for the District of Colorado. During this period of time I was assigned to prosecute the cases of United States v. Arthur Mares and United States v. Albert Mares, in which Arthur and Albert Mares were charged with armed robbery of the Key Savings and Loan Association, located in the Alameda Shopping Center, Denver, Colorado.

Three trials were held in the course of the prosecution of these cases. The first trial was United States v. Arthur Mares, which I conducted together with Assistant United States Attorney Donald E. Cordova. At this trial, one R. F. May, of 4870 West Oregon Place, Denver, was subpoenaed as a witness for the Government. Mr. May was subpoenaed because of an FBI Report which indicated that he was present at the shopping center on the day of the robbery and had seen a pick-up truck similar to the one which the investigation disclosed had been used by the Mares at the time of the robbery. Prior to the trial or during the early stages of it, I met with Mr. May and showed him a photograph of the actual truck used in the robbery. Mr. May clearly stated that that was not the same truck which he had seen. Accordingly, Mr. May was informed that it would not be necessary for him to testify and that he was free to leave if he wished to do so. At no time was I ever informed that Mr. May had seen anyone in or coming out of the Key Savings and Loan Association on the day of the robbery, nor have I ever had any discussion with Mr. May about his seeing anyone at the bank on the day of the robbery.

During the first trial of Arthur Mares, Eugene Deikman, Esquire, counsel for the defendant, asked me who the witness R. F. May was and what he was to testify to. I believe that Mr. May's name appeared on a list of witnesses furnished to defense counsel at the commencement of the trial. I told Mr. Deikman, in substance, that May was a person who had seen a truck at the shopping center but that we had determined that it was not the same truck used by the Mares and, accordingly, we did not intend to call Mr. May as a witness. It is my recollection that Mr. May was not subsequently subpoenaed either for the trial of Albert Mares or for the second trial of Arthur Mares.

Other than as stated above, I can recall no conversation with Mr. Deikman

during any of the three trials regarding a witness who was not called to testify. I have never had any information from any source that there was a witness who had seen the robbers leaving the bank. I am thoroughly familiar with the thorough investigative report submitted by the FBI relative to these cases and I am sure that there is no information contained in such report which indicates that any witness viewed the robbery in progress, other than the two employees of the Key Savings and Loan Association, who were the victims of the robbery.

### AFFIDAVIT

COMES NOW Eugene Deikman, and, upon his oath, deposes and states:

I have been asked by Harry Titcombe, court appointed attorney for Albert Mares, to set forth in an Affidavit for him what I recall concerning a conversation with Mr. Spriggs, of the United States Attorney's Office, in connection with a witness known to Mr. Spriggs who was not called at the trial of either Albert or Arthur Mares. My recollection concerning this conversation is as follows:

The conversation occurred toward the end of the prosecution's case in the first trial of Arthur Mares. The United States Attorney had already presented the victims of the robbery, F.B.I. Agents who had investigated the robbery, Edwardo Edmundo Romero, Priscilla Trujillo, Lorraine Griego, Fred and Jean Miyamoto, and Jewell Boswell. Since I had no way of knowing what witness might be produced next, or what problems I could anticipate from unknown witnesses, I approached Mr. Spriggs during a recess, and attempted to provoke him to reveal the balance of his case by a somewhat joking reference to the witness Jewell Boswell. As background for this, I must explain that Mr. Spriggs had earlier indicated that a clerk from the King Department Store, in other words Jewell Boswell, would testify that the Defendant was seen within minutes *prior to* the robbery, but her testimony on the stand could only lead to the conclusion that the men she identified were seen by her within minutes *after* the robbery. This I took to be somewhat surprising to Mr. Spriggs, and a flaw in their circumstantial evidence, because I understood the Government's theory to be that the Mares Defendants launched their attack upon the Key Savings and Loan from the department store. As it turned out, neither the court nor the jury regarded this as a flaw, because the Government conformed its closing arguments to the evidence as it was presented.

I said something to the effect to Mr. Spriggs: "Do you have any more unreliable witnesses like Jewell Boswell?" Mr. Spriggs replied to the effect: "I don't think she is unreliable. If you think she is unreliable, you ought to see the man who claims he saw the Mares brothers get away in a white pick-up truck." I asked whether he was going to produce this witness, and Mr. Spriggs replied that he was not, that he regarded the witness as unreliable. I asked him what he meant by that, and Mr. Spriggs said that the man appeared to be very eager to testify, suspiciously eager, and seemed to be coming up with more details all the time as it was indicated to him what the Government wanted him to testify about. He felt in all fairness that such a witness should not be presented. I breathed an inward sigh of relief to not be in the position of confronting an eye-witness against my client, because the jury might not have been as good a judge of character as Mr. Spriggs. Naturally, I was no longer, under those circumstances, at all interested in that witness, and the less I heard of him, the better. Had I been given any inkling that the witness would testify that the Defendants did not fit the description of the men he saw, and that he did, in fact, have a good opportunity to see the men and to describe them, I would, of course, have demanded his name, and that he be produced.